## AFFIDAVIT OF SPECIAL AGENT TIMOTHY J. QUINN

I, Timothy J. Quinn, being duly sworn, hereby depose and state as follows:

### I.  INTRODUCTION

1.   I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18 of the United States Code, in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately 11 years.  I am currently assigned to the Lakeville Resident Agency within the Boston Division, where my primary duties involve the investigation of federal drug and weapons-related offenses.

3.   During the course of my employment with the FBI, I have conducted investigations of numerous violations of federal law involving bank robberies; white collar crime matters, including mail, wire, telemarketing, bankruptcy, and insurance fraud; interstate transportation of stolen property; complex securities fraud; fugitive investigations; and gang, drug, and weapons-related crimes.

4.   I have received specialized training regarding the activities of narcotics traffickers and various aspects of

1

narcotics investigations, including the methods used to package, transport, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics-trafficking activities.

5.   In addition to my training, I have had extensive experience in the investigation of the activities of narcotics traffickers.  Since joining the FBI, I have participated as a case agent and in subsidiary roles in dozens of narcotics investigations relating to the distribution of controlled substances, including cocaine, heroin, cocaine base, marijuana, and other illegal substances in violation of the federal and state anti-drug laws, including Title 21, United States Code, Sections 841(a)(1) and 846.  I have participated in almost all aspects of narcotics trafficking investigations, including but not limited to conducting surveillance, using confidential informants and undercover officers, executing arrest and search and seizure warrants, and conducting court-authorized wire and electronic surveillance.  I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics-trafficking activities and the operation of narcotics-trafficking organizations.  I have sworn out numerous affidavits in support of search warrants, arrest warrants and other court applications.

6.    Through my education, training and experience, I have become familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national, and international levels.  Specifically, I have become familiar with how narcotics traffickers distribute, store, and transport narcotics and how they collect the money that constitutes the proceeds of narcotics-trafficking activities.  I am aware that drug traffickers commonly use cellular telephones in furtherance of their activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.  I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in a further effort to prevent detection.  I am familiar with the common appearance, packaging, texture and smell of various narcotics, including heroin, cocaine, crack cocaine and marijuana.

## II.    OVERVIEW OF THE INVESTIGATION

7.    I have personally participated in the investigation of the subjects named in this Affidavit since the fall of 2008.  I am familiar with the facts and circumstances of this investigation based on information I have received from a variety of sources, including but not limited to my own personal participation in the investigation, oral and written reports made

3

to me by other law enforcement officers and agents, physical surveillance, trash covers, debriefings of confidential informants and cooperating witnesses, public records, telephone toll records, pen register and trap and trace information, recorded jail calls, and my review of tapes and transcripts of court-ordered intercepted conversations and summaries of wiretap interceptions.

8.    I am submitting this affidavit in support of a criminal complaint for the following individuals:

       (a)   Joel ARIAS (dob: -/-/1986) (hereinafter "ARIAS");

       (b)   Bonnie BEARSE (dob: -/-/1963) (hereinafter "BEARSE");

       (c)   Thomas GILSON (dob: -/-/1963) (hereinafter "GILSON");

       (d)   Adalberto GRACIANI, a/k/a "Berto" (dob: -/-/1973) (hereinafter "GRACIANI")

       (e)   Delrico GRAHAM, a/k/a "Rico" (dob: -/-/1960) (hereinafter "GRAHAM");

       (f)   Kyle HICKS, a/k/a "Sleepy," a/k/a "Sleep" (dob: -/-/1982) (hereinafter "HICKS");

       (g)   Richard JACKSON, a/k/a "Rick" (dob: -/-/1958) (hereinafter "JACKSON");

       (h)   Jonathan MCGEE-BAKER, a/k/a "Black" (dob: -/-/1988) (hereinafter "MCGEE-BAKER");

       (i)   Stefan PINA, a/k/a "Stephen," a/k/a "Milk" (dob: -/-/1970) (hereinafter "PINA");

       (j)   Gregory SLAYTON (dob: -/-/1956) (hereinafter "SLAYTON");

4

      (k)   Anthony VAUGHN, a/k/a "Tony," a/k/a "TV," a/k/a "Little Tony" (dob: -/-/1979) (hereinafter "VAUGHN"); and

      (1)   Jeremy WOBECKY (dob: -/-/1974) (hereinafter "WOBECKY"),

charging that beginning on an unknown date but at least from in or about August 2008, and continuing until on or about November 16, 2010, each did knowingly and intentionally combine, conspire, confederate and agree with each other and with others known and unknown, including Russell ROSE a/k/a "Double R," a/k/a "Baby Russell" (hereinafter "ROSE"); Kelvin FRYE, a/k/a "Kelvin Andrews," a/k/a "Brian Wright," a/k/a "Cool Kel," a/k/a "Cool Cal" (hereinafter "FRYE"); Omay FORD, a/k/a "Papa Doc" (hereinafter "FORD"); and Michael ANDREWS (hereinafter "ANDREWS"),[1] to possess with intent to distribute and distribute 100 grams or more of heroin, a Schedule I controlled substance, and 500 grams or more of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B) and 846.  This affidavit does not contain all of the facts known to me as a result of my investigation; instead, it contains only those facts sufficient to establish probable cause for the criminal complaint.

---

[1]  ROSE, FRYE, FORD, and ANDREWS are currently facing federal drug-trafficking charges in United States v. Russell Rose, et al., No. 11-10062-NMG, in connection with their participation in this conspiracy.

III. **SUMMARY OF EVIDENCE**

9.    This investigation concerns a longstanding, entrenched conspiracy to distribute cocaine and heroin in the Cape Cod region.  The leaders of the conspiracy were ROSE and FRYE (both of whom have already been charged), and GRACIANI and HICKS.  The evidence establishes that ROSE, FRYE, GRACIANI and HICKS obtained cocaine from suppliers, including FORD (who has already been charged), and heroin from suppliers, including ARIAS.  Although each individual's role in the conspiracy varied over time, their basic roles were as follows:  SLAYTON and GRAHAM were directed by one or more of the leaders to pick up and deliver the drugs. PINA and JACKSON assumed a variety of roles, including testing the drugs for quality, and selling the drugs to customers. MCGEE-BAKER and ANDREWS (who has already been charged) were two of the conspiracy's principal drug distributors.  Both fielded orders from customers, and both sold drugs to their customers. BEARSE, GILSON, and WOBECKY were dealers who obtained heroin and/or cocaine from MCGEE-BAKER for resale to their own customers.  VAUGHN, who is currently incarcerated in federal prison in Louisiana, sought to obtain heroin from various members of the conspiracy for redistribution and/or personal use.

A.    Index of Probable Cause

10.    Probable cause for issuance of a criminal complaint is set out throughout this Affidavit; for ease of reference, the

following is a paragraph index to the principal statements of probable cause for each of the defendants:

  (a)  ARIAS – ¶¶ 67, 85-86, <u>see also</u> ¶¶ 68-84, 87-89;

  (b)  BEARSE – ¶¶ 137-150;

  (c)  GILSON – ¶¶ 151-167;

  (d)  GRACIANI – ¶¶ 32-45, 69-72, 76-78, 85-89, 115-116, 118-119, 121-123, 126, 133-35;

  (e)  GRAHAM – ¶¶ 91-108, 168-178, 179-184, 205;

  (f)  HICKS – ¶¶ 12-14, 15-21, 29-30, 32-35, 69-70, 81, 91-93, 95-97, 98-99, 113-114, 123-126, 168-178, 179-184;

  (g)  JACKSON – ¶¶ 79-80, 128-130, 185-205;

  (h)  MCGEE-BAKER – ¶¶ 138-141, 145-150, 152-157, 160-161, 163-164, 166-167;

  (i)  PINA – ¶¶ 22-23; 48-49; 52-65; 68, 73, 75, 79-80, 83-85, 113-114, 117, 119-120, 125, 127-128, 131, 206-215;

  (j)  SLAYTON – ¶¶ 90, 96-97, 100-102, 104-105, 171, <u>see generally</u> 90-108;

  (k)  VAUGHN – ¶¶ 29-33, 35, 37-39, 46-51, 54-55, 84, 111-112; and

  (l)  WOBECKY – ¶¶ 216-241.

B.    **Initiation of Investigation**

11.    This investigation began in approximately May 2008,
when the Bourne Police Department received information from
confidential informants about a drug trafficking organization
operating from E-Customs, a purported jet ski/motorcycle repair
shop in Bourne, MA, believed to have been co-owned and co-managed
by HICKS. Agents initiated physical surveillance and other
investigative steps to determine the scope of the criminal
activity.

      1.    **Surveillance of HICKS's business and HICKS's
residence, as well as a review of trash recovered
from HICKS's residence, indicated that HICKS was
engaged in drug trafficking**

12.    HICKS operated a business called E-Customs, which was
purported to be a motorcycle and jet ski repair shop located at
175 Clay Pond Road, Bourne, MA.  E-Customs was owned and operated
by HICKS and another individual until the Fall of 2008, when it
went out of business.  From approximately March 2008 to August
2008, surveillance officers observed HICKS at E-Customs on dozens
of occasions.  As early as March 2008, officers responsible for
policing the area observed a significant increase in traffic at
the business.  The activities of HICKS and many of the
individuals who were observed visiting E-Customs were consistent
with activities frequently displayed by narcotics traffickers.
Many vehicles remained at the location for only short periods of
time.  The vehicles' occupants remained in their cars until they

had brief meetings with HICKS or other individuals exiting E-Customs. Some individuals entered E-Customs, only to return to their cars within a few minutes of their arrival.  Few, if any, of the visitors arrived with motorcycles or jet skis.  Criminal history checks were conducted on many of the individuals who visited E-Customs; those checks indicated that many of the individuals had prior drug and weapons-related arrests and convictions.

13.  At various times in 2008 and in 2009, investigators also conducted intensive surveillance at HICKS's then-residence at 90B Waterhouse Road, Bourne, MA.  Surveillance officers made similar observations - there was a high volume of vehicle traffic; individuals arrived at the residence and remained in their cars until they were observed having brief meetings with HICKS or other individuals in the driveway; individuals entered HICKS's residence only to depart within minutes of their arrival; and many visitors had criminal histories containing one or more arrests or convictions for drug or weapons-related offenses - thus suggesting that HICKS's residence was also being used for narcotics trafficking.

14.  Additionally, officers examined the trash from 90B Waterhouse Road, Bourne, MA (HICKS's then-residence) on more than 40 occasions between October 2008 and July 2009.  Agents discovered and seized the following items:  1) several one-gallon

plastic zip lock freezer bags containing large amounts of a white powdery residue that field-tested positive for the presence of cocaine; 2) other bags containing residual amounts of a green leafy substance, consistent in odor and appearance with marijuana; 3) several smaller bags that field-tested positive for the presence of heroin; 4) several large bottles of Inositol, a substance commonly used by drug dealers for "cutting" cocaine and heroin; 5) receipts for Inositol; 6) a small electronic scale; and 7) plastic gloves. Agents believe that the recovered items were evidence of HICKS's involvement in drug trafficking activities – specifically, the preparation of retail quantities of cocaine and heroin for distribution.

> 2. **Prison tapes containing recorded telephone calls placed by FRYE confirmed that HICKS was involved in drug trafficking**

15. In the summer of 2009, investigators subpoenaed recorded telephone calls placed by FRYE while he was incarcerated.[2] Agents believe that these prison tapes, which included conversations between FRYE and ROSE, GRACIANI, and/or HICKS, concerned drug trafficking activities. Certain of the conversations establish that HICKS participated in drug trafficking with FRYE and GRACIANI.

---

[2] FRYE was an inmate at the Barnstable County Correctional Facility where a recording preceding each call notified the inmate and the recipient that the call was being monitored and recorded.

16.    One of FRYE's recorded prison calls on February 12, 2009, establishes that FRYE called and spoke with GRACIANI, who asked FRYE if he had talked to "Sleep."[3] GRACIANI informed FRYE that "Sleep" was home with his family, and that "two rats ran up in his trap." GRACIANI stated that they had his "yeh mean," and later added "2 G and yeh mean." FRYE asked GRACIANI, "You mother fuckers know who it is?" GRACIANI responded no, but that they were trying to find out. GRACIANI told FRYE, "We eat it too nigger." FRYE replied, "You better."

17.    Based upon their knowledge, training, and experience, and their participation in this investigation, agents believe that in this call, GRACIANI asked FRYE whether he had spoken with HICKS ("Sleep"). GRACIANI told FRYE that two individuals did a home invasion ("two rats ran up in his trap") while HICKS was home with his family. GRACIANI further advised FRYE that the robbers obtained $2,000 and some drugs ("2G and yeh mean").

---

[3]    Agents working on the investigation identified GRACIANI as the speaker based upon various factors including, but not limited to, the following: First, the telephone number FRYE called (508-926-4569) was subscribed to in GRACIANI's wife's name (Erin Graciani). Second, during other recorded prison calls of FRYE, FRYE instructed his girlfriend to place a 3-way call to "Berto." Toll records indicate that she called this same number, and the tape recording of the call indicates that GRACIANI joined the call. Third, during numerous calls intercepted in 2010, GRACIANI made statements concerning his location that were consistent with ongoing physical surveillance. Fourth, on several occasions, FRYE was intercepted in 2010 telling GRACIANI that FRYE was heading to GRACIANI's house, and FRYE was subsequently observed by surveillance officers arriving at GRACIANI's house.

GRACIANI told FRYE that they did not know who broke into HICKS's home, but that they were trying to figure it out. GRACIANI told FRYE that any losses suffered by HICKS were suffered by all of them ("we eat it too nigger").

18. In another of FRYE's prison calls, which was recorded on February 13, 2009, FRYE spoke with ROSE about the home invasion at HICK's residence. ROSE told FRYE that he had spoken with HICKS the day before.[4] FRYE told ROSE that the home invasion happened because HICKS had "all those niggers in and out" of his house. FRYE noted that HICKS had too many people coming and going, and strange people dropping people off.

19. This call confirmed that HICKS was engaged in drug trafficking at his home. Agents believe that FRYE, in this call, expressed his view that HICKS's home was robbed because HICKS had too many drug customers coming to HICKS's residence ("all those niggers in and out").

20. On February 16, 2009, FRYE spoke with GRACIANI in another recorded prison call. FRYE asked GRACIANI how "Sleep" was, and said that "Sleep" was not staying at the house.

---

[4] Agents working on the investigation identified ROSE as the speaker in these calls based upon various factors, including, but not limited to, the following: First, during calls intercepted in 2010, an individual with the same voice identified himself as "Russell" and "Russ." Second, during numerous intercepted calls in 2010, ROSE made statements concerning his location that were consistent with ongoing physical surveillance. Third, an agent working on the investigation recognizes ROSE's voice from a review of prison tapes on which ROSE was recorded.

GRACIANI responded that "Sleep" was back at the house, but that
"Rachel" was "shook up." Later in the call, GRACIANI told FRYE
that "Rachel" was not ready for FRYE to come home because FRYE
was "one crazy fucker." FRYE told GRACIANI that HICKS was going
to do anything that FRYE did when FRYE got home, and that HICKS
was not going to have a problem with it. GRACIANI observed that
HICKS was loyal, and added that HICKS had slowed down a bit.
FRYE responded that this was because FRYE was not home.

21. Agents believe that in this call FRYE and GRACIANI were
again talking about the home invasion at HICKS's residence.
GRACIANI told FRYE that HICKS's girlfriend ("Rachel") was still
upset about the home invasion. GRACIANI informed FRYE that
HICKS's girlfriend was not ready for FRYE's release from prison.
FRYE reassured GRACIANI that HICKS was going to continue selling
drugs with FRYE after FRYE was released from prison.

### 3. Title III Electronic Surveillance

22. Based in part upon controlled drug purchases from FRYE
and his associates by a confidential informant, I discovered that
a cellular telephone ("Target Telephone # 1") was being used by
ANDREWS and/or FRYE to facilitate the drug trafficking
conspiracy. Beginning in June 2010, the FBI obtained court
authorization to intercept wire communications to and from Target
Telephone #1. (M.B.D. No. 10-10198). Intercepted wire
communications established that Target Telephone #1 was used by

ANDREWS and FRYE, and that they operated a robust retail-level cocaine and heroin distribution business on Cape Cod. As discussed below, intercepted telephone calls on Target Telephone #1 - as interpreted using my knowledge, training, and experience as well as subsequently intercepted calls on other cellular telephones - established that various individuals, including JACKSON and PINA, regularly obtained quantities of heroin and/or cocaine from ANDREWS and FRYE for purposes of re-distribution and personal use. Intercepted communications over Target Telephone #1 further indicated that ANDREWS acted at FRYE's direction.

23. Agents thereafter identified two cellular telephone numbers used by FRYE in furtherance of the drug-trafficking organization ("Target Telephone #2" and "Target Telephone #3"). Agents obtained court-ordered authorization for the interceptions of Target Telephones #2 and #3 in August 2010 (M.B.D. No. 10-10198). Interceptions of Target Telephone #2 confirmed that FRYE was engaged in an ongoing drug-trafficking organization and provided some indication as to FRYE's relationship with other senior members of the organization, including ROSE, HICKS, and GRACIANI. As will be discussed below, two separate search warrants were obtained based in part upon intercepted telephone conversations between VAUGHN, GRACIANI, and FRYE on Target Telephone #2, during which VAUGHN, a federal inmate in Louisiana, sought FRYE's assistance in having heroin sent to individuals at

14

VAUGHN's direction.[5]  The first seized package — which intercepted calls and surveillance showed was prepared and shipped by GRACIANI and another individual whose identity is known to me[6] — contained approximately 18.6 grams of heroin.  The second seized package —  which intercepted calls and physical surveillance established was prepared by FRYE and PINA, and shipped by another individual whose identity is known to me[7] — contained approximately 11.1 grams of heroin.  Intercepted conversations on Target Telephone #2 also provided information concerning heroin suppliers for GRACIANI, FRYE, and HICKS.  Based in part upon other intercepted telephone conversations between GRACIANI and FRYE on Target Telephone #2, a traffic stop and subsequent search of a vehicle driven by ARIAS (one of GRACIANI and FRYE's heroin suppliers) resulted in the seizure on September 28, 2010, of approximately 200 grams of heroin that was intended for FRYE and had been coordinated by GRACIANI.

---

[5] In 2002, VAUGHN was convicted in the District of Massachusetts for possession with intent to distribute cocaine (No. 01-CR-10352).  ROSE and VAUGHN were co-defendants in that case.  In 2007, FRYE was convicted in U.S. District Court in the Southern District of New York (No. 05-CR-1201) for conspiracy to provide contraband (marijuana) to VAUGHN while VAUGHN was in federal prison.

[6] Agents believe that they know the identity of this individual.  However, because he is not being charged at this time, I am not identifying him in this affidavit.

[7] Agents identified this individual, who actually shipped the package in question.  However, because he is not being charged at this time, I am not identifying him in this affidavit.

24.   In September 2010, agents obtained court authorization for the interception of a cellular telephone used by GRAHAM (hereinafter "Target Telephone #4").   Interceptions on that phone established that GRAHAM ran an active cocaine and heroin distribution business with a variety of customers.   Interceptions on Target Telephone #4 further established that GRAHAM took directions from ROSE and HICKS, and that GRAHAM agreed to travel to various locations to meet with individuals, including FORD and SLAYTON, to either retrieve or return large quantities of drugs on behalf of ROSE and HICKS.   The interceptions on Target Telephone #4 further established that GRAHAM did so in exchange for payment from ROSE and HICKS in the form of smaller quantities of drugs.   Based in part upon intercepted telephone conversations between HICKS, SLAYTON, and GRAHAM on Target Telephone #4, GRAHAM was arrested on September 29, 2010, after a traffic stop and subsequent search which resulted in the seizure of approximately 100 grams of heroin that he had just received from SLAYTON pursuant to HICKS's instructions.

25.   In October 2010, agents obtained court authorization to intercept a cellular telephone used by ROSE (hereinafter "Target Telephone #5").   Interceptions over Target Telephone #5 lasted only approximately two days before ROSE suspended use of the phone, and provided modest evidence of ROSE's criminal activities.

26.  Thereafter, in November 2010, agents obtained court authorization to intercept two additional cellular telephones: one used by MCGEE-BAKER (hereinafter "Target Telephone #6"), and one used by ROSE (hereinafter "Target Telephone #7"). Interceptions of telephone conversations over Target Telephone #6 showed that MCGEE-BAKER was an established drug trafficker, who regularly sold heroin and/or cocaine to numerous individuals, including BEARSE, GILSON, and WOBECKY.  Interceptions over the Target Telephones further established that MCGEE-BAKER worked for ROSE in the drug trafficking organization, and that he obtained cocaine and heroin from ROSE.

27.  Based in part upon information obtained from interceptions of telephone conversations on November 16, 2010, between FORD and ROSE, between FRYE and ROSE, and between ROSE and ANDREWS over Target Telephone #7, agents obtained and executed a federal search warrant at ROSE's residence on November 17, 2010, and seized, among other items, approximately two kilograms of cocaine and more than $75,000 in United States currency.

IV.  **SUMMARY OF NARCOTICS SEIZURES**

28.  Agents developed probable cause to seize two packages containing heroin based upon intercepted wire communications involving FRYE, GRACIANI, VAUGHN, and PINA combined with physical surveillance.  Additionally, based in part upon other intercepted

17

telephone calls involving GRACIANI, FRYE, PINA, VAUGHN, HICKS, and SLAYTON, and upon physical surveillance, law enforcement agents developed probable cause that resulted in the seizure of heroin from two vehicles – one driven by ARIAS, the other occupied by GRAHAM.  Finally, intercepted calls involving ROSE, FRYE, FORD, and ANDREWS led to the seizure of cocaine from ROSE's residence.  These seizures are described below.

**A.    September 9, 2010:  Agents Seized Approximately 18.6 Grams of Heroin That FRYE Arranged for GRACIANI to Send to VAUGHN**

29.  On September 6, 2010, at approximately 1:47 p.m., FRYE received a call on Target Telephone #2 from telephone number 909-743-9780 (hereinafter "VAUGHN Telephone #8"), and FRYE[8] spoke with VAUGHN.[9]  VAUGHN asked FRYE, "You going to be able to give

---

[8] Agents working on the investigation identified FRYE as the speaker in intercepted wire communications based upon various factors including, but not limited to, the following:  First, Target Telephone #2 was subscribed in FRYE's name.  Second, during numerous intercepted calls, FRYE made statements concerning his location that were consistent with ongoing physical surveillance.  Finally, the agents are familiar with FRYE's voice based upon their review of various recorded prison calls in which FRYE was a participant.

[9] Agents working on the investigation identified VAUGHN as the speaker in intercepted wire communications based upon various factors including, but not limited to, the following:  First, during certain intercepted calls, individuals, including VAUGHN himself, referred to VAUGHN by VAUGHN's known nicknames, such as "TV" or "Little Tony."  Second, during certain intercepted calls, VAUGHN, who was a federal inmate in Louisiana at the time of the calls, made reference to being in a cell or being in lockdown.  Third, historical cell site information for three of the telephones used by VAUGHN confirmed that certain of the calls
(continued...)

18

that – grab that thing from, ah, from young-in?"[10]  FRYE

answered, "I'll grab it from Sleep."  VAUGHN told FRYE, "Tell

Sleep if he did the fucking karate, Cape Cod Karate chop."  FRYE

answered, "Na, na.  He usually put something to the side.  Just

in case I want to grab some."  VAUGHN instructed FRYE, "Double

check with him today ... cause I don't want to be fucking assed

up."

    30.  Agents believe that in this call VAUGHN asked FRYE if

he had obtained heroin ("that thing") yet.  FRYE told VAUGHN that

he was going to get it from HICKS ("grab it from Sleep").  Upon

hearing that, VAUGHN warned FRYE to make sure that HICKS had not

cut the heroin ("Cape Cod karate chop").  FRYE reassured VAUGHN

that HICKS usually kept a quantity of uncut heroin ("something to

the side") available for FRYE ("in case I want to grab some").

    31.  On September 7, 2010 at approximately 8:19 p.m., FRYE

placed a call from Target Telephone #2 to telephone number

909-827-2963, subscribed to in the name of Anthony Cedada, 11920

Verona Drive, Fontana, CA 92337 (hereinafter "VAUGHN

---

[9](...continued)
being attributed to VAUGHN involved cell phones in the vicinity
of the federal prison where VAUGHN was incarcerated at the time
of calls in question.  Fourth, the agents have compared various
recorded prison calls in which VAUGHN was a participant and
concluded that the voice on the tape is similar to VAUGHN's.

[10]  All quotations are from the "line sheets" associated
with the intercepted calls, and represent preliminary, draft
transcriptions of what was actually said during the call.

Telephone #1"), and spoke with VAUGHN.  During the call, VAUGHN
said he had heard that FRYE texted some "bad news" and asked what
happened.

    32.    FRYE said, "That nigger couldn't find it yo, he said
like someone dug it up or an animal took that shit. So he gonna
go back over there in the morning and look for it again." VAUGHN
then asked whether an individual named Ty had anything.  FRYE
said he did not know.  Later, when discussing "Kyle," FRYE
reiterated that "this nigger saying can't find it."  FRYE again
said that he was going to try again tomorrow.  VAUGHN asked "How
much is it?"  FRYE responded, I didn't even ask all that ... he
shook right now, [unintelligible] that much."  VAUGHN indicated
that it was unlikely that he was going to find what was missing,
saying that the "fat nigger" was not going to try because he was
"lazy."  VAUGHN then asked whether "other people" had any.  FRYE
said he didn't even try because "they going to take a day to get
down here."  VAUGHN said, "Well, hopefully he finds something
tomorrow cause I was suppose to put it in the mail tomorrow."
VAUGHN then asked whether "Berto" had anything left.  FRYE said
that "Berto" did.  FRYE reminded VAUGHN that VAUGHN previously
stated that he did not want "that one."  VAUGHN said he was trying
to find out if it was "fucked up."  Later on in the conversation,
VAUGHN said that if worse came to worst, FRYE should check with
"Berto" to see if he had it.  FRYE said he knew that GRACIANI

(i.e., "Berto") still had it because GRACIANI "was trying to hand it off to me the other day." VAUGHN said that if worse comes to worst, "we can just grab something right there and just get that shit out."

33. Agents interpret this call as follows: Vaughn and FRYE were discussing possible sources of heroin supply. The first possibility, HICKS ("Kyle"), had apparently misplaced his stash ("That nigger couldn't find it yo"). VAUGHN was skeptical of HICKS's pledge to attempt to find heroin the next day, describing HICKS as "fat" and "lazy." After discussing other possibilities, VAUGHN suggested GRACIANI ("Berto"). Towards the end of the call, VAUGHN and FRYE agreed that if worse came to worst, they could obtain the heroin from GRACIANI, who FRYE knew was still in possession of the sought-after drugs.

34. On September 8, 2010, at approximately 11:19 a.m., FRYE received a call on Target Telephone #2 from telephone number 508-566-7616, subscribed to in the name of Erin Graciani, P.O. Box 1012, E. Falmouth, MA 02536 (hereinafter, the "GRACIANI Telephone"), and FRYE spoke with GRACIANI. During this conversation FRYE asked GRACIANI, "Fucking ya, you got that thing yo?" GRACIANI said, "Yeah." FRYE then added, "Cause Little Tony need that shit." GRACIANI responded, "I, I think there's two or three there, I'm not sure." FRYE said that "he needs two of them, you know that nigger, he's always got something up." FRYE

then stated, "I was going to get it from Sleep yesterday but that nigger lost his shit."  FRYE laughed, and GRACIANI commented, "He always loses something like that .... He's been doing that for years, you know what, that nigger could have a fucking, a motherfucking Mike Tyson house by now ... with all the times that that shit happen."

35.  Based on previous and subsequent intercepted telephone calls during this investigation, agents believe that during this conversation, FRYE attempted to procure heroin ("two of them") from GRACIANI on behalf of VAUGHN ("Little Tony").  FRYE commented that he had planned to obtain the heroin from HICKS ("Sleep"), but HICKS had apparently misplaced his supply of heroin ("lost his shit").

36.  On September 8, 2010, at approximately 4:29 p.m., FRYE used Target Telephone #2 to call GRACIANI.  FRYE asked GRACIANI, "You, you gonna go over to the post office, right?" GRACIANI responded, "Yeah, but he, he want, he just text me, he wanted to see if I wanted to do it.  But now he's telling me, you know what I mean, he telling me that, he told me a certain way to do it.  But, I don't want to put my face in the fucking ... At the post office I don't want to ... I'll do it but ... this nigger right here on the other line, let me call you right back."

37.  Agents believe that during this call, GRACIANI indicated that he had agreed to bring the heroin to the post

office to mail it to VAUGHN.  GRACIANI expressed his reluctance to go to the post office, probably because of the risk of being seen on surveillance cameras, but said he would do so nonetheless.

38.  Later that day, at approximately 8:47 p.m., FRYE received a call on Target Telephone #2 from VAUGHN Telephone #1, and FRYE spoke with VAUGHN.  VAUGHN stated that he had talked to "Berto" (as noted, "Berto" is a nickname for GRACIANI).  VAUGHN told FRYE that GRACIANI said, "'No, I don't want to go into the post office and have my face in there.'"  VAUGHN recounted that he had questioned GRACIANI about whether the post office even had cameras, and that GRACIANI had responded that cameras were present.  VAUGHN then said that he believed GRACIANI was "scared," but that GRACIANI "was going to have somebody do it in the morning time."  VAUGHN then said that "it ain't nothing, as long I, as long as it gets there by Friday."  VAUGHN expressed concern to FRYE, "It kinda made me nervous when the nigger ain't want no money for them.  'I'm like man, you sure that shit's alright?  You trying to give this shit away free?'"  FRYE reassured VAUGHN, "Nah, nah, it's the same shit nigga's be getting though."  After VAUGHN said, "It ain't the best, but it ain't the worst," FRYE explained to VAUGHN, "Yeah.  Yeah.  I had the same one.  I had the same one.  It was like a week or two ago."  VAUGHN asked, "And Pops said it was straight?"  FRYE

answered, "Yeah, yep.  He, he did – cause that's the only time I
take it."

39.  Agents believe that in this call, VAUGHN told FRYE that
GRACIANI was going to ship him the heroin, but that GRACIANI was
nervous about going into the post office because of the cameras.
VAUGHN told FRYE that he was concerned that GRACIAINI did not
want any money for the heroin (which could indicate that the
drugs were of poor quality).  FRYE reassured VAUGHN that he had
gotten some of the same drugs that GRACIANI was going to send to
VAUGHN.  VAUGHN asked FRYE whether another individual thought the
heroin okay ("Pops said it was straight?"), and FRYE reassured
VAUGHN that he only bought drugs after the drugs were tested
("cause that's the only time I take it.")

40.  On September 9, 2010, at approximately 11:59 a.m., FRYE
used Target Telephone #2 to call GRACIANI.  During the call,
GRACIANI said that he was "just trying to take care of this real
quick."  GRACIANI added, "I'm already on it. I'm already at the
yeh mean. Should be done in like about five, seven minutes,
brother."

41.  Agents believe that, during this call, GRACIANI
communicated to FRYE that he was already at the post office ("yeh
mean," or "you know what I mean").

42.  Meanwhile, agents and officers involved in the
investigation were conducting physical surveillance in the

24

vicinity of parking lot of the United States Post Office, 1672
Falmouth Road, Centerville, Massachusetts.  Shortly after 1:00
p.m., agents observed GRACIANI entering the parking lot operating
a gray 2003 Infiniti G35 bearing Massachusetts registration
721GB8 and registered in his name (hereinafter "GRACIANI Vehicle
#1").  GRACIANI parked GRACIANI Vehicle #1 in a parking space
close to the entrance of the Post Office, and a black male whose
identity is known to me was observed exiting the front passenger
door of GRACIANI Vehicle #1.  Agents observed this black male
carrying an unidentified object in his hands.  At approximately
1:14 p.m., agents observed the black male walk into the Post
Office carrying the unidentified object.  Approximately ten
minutes later, the black male exited the Post Office.  At that
time, he was observed placing what appeared to be a letter in the
mail box located just outside the front door of the Post Office.
The black male then returned to GRACIANI Vehicle #1 and entered
the front passenger side.  GRACIANI and the black male then drove
away from the Post Office.

43.  Approximately 20 minutes later, agents interviewed a
clerk inside the Post Office concerning the black male's
activities.  The clerk stated that individual in question entered
the Post Office carrying an "Express Mail" envelope addressed to
an individual in Bossier, Louisiana, paid the mailing fees, asked
if the intended recipient would have to sign for the package, and

specifically requested that the recipient not be required to sign for the package.

44.  Following this interview, the clerk accessed a computer in the Post Office lobby and retrieved information concerning the Express Mail package.  The package was addressed to Sandra Smith, 3225 East Texas Street, Apt. 423, Bossier City, LA 71111 and had a return address of "Marcus Houston, 115 Princeton Street, Teaticket, Mass. 023536."

45.  The next day, agents obtained a warrant from a Magistrate Judge in the District of Massachusetts to search the Express Mail package.  No. 10M-1122-JGD.  Inside the package was a Family Circle magazine and a Little Debbie chocolate pie box containing a chocolate pie stuffed with two green balloon-like items containing 18.6 grams of a substance that tested positive for heroin.

**B.  September 21, 2010:  Agents Seized Approximately 11.1 Grams of Heroin That FRYE Attempted to Mail to VAUGHN**

46.  Between September 18, 2010, and September 21, 2010, agents intercepted a series of telephone calls between FRYE and VAUGHN concerning their plan to place a second package containing heroin in the mail from FRYE at VAUGHN's request.  Based upon those intercepted calls, surveillance agents observed the shipment of a package, which was later opened pursuant to a federal search warrant.  The package contained approximately 11.1 grams of heroin hidden in a toy box.

47. On September 18, 2010, at approximately 9:37 p.m., FRYE received a call on Target Telephone #2 from VAUGHN Telephone #1, and FRYE spoke with VAUGHN. During the call, VAUGHN stated, "All I need you to do is fucking grab like ... a little stuffed animal type shit that comes like in a a box, like, just something small. It ain't gotta be nothing big then .... That way I can have the nigga just put them inside there, it's still in the box so when the nigga go over there ... to send it ... they don't even, it's there, just grab like a card and just put it with it, like yo, I'm trying to overnight ...."

48. On September 20, 2010, at approximately 1:48 p.m., VAUGHN called FRYE on Target Telephone #2. VAUGHN asked FRYE whether he had spoken with "Berto." After FRYE told VAUGHN that "Berto" was in Hyannis, VAUGHN asked FRYE, "You ain't got nobody to wrap that thing?" VAUGHN complained, "Man you act like you handicapped or something man, like you can't do it man ... it ain't hard man." FRYE responded, "I already tried to do it though. That shit's a pain in the ass." Later, FRYE told VAUGHN that he would "try to get a hold of Milk again."

49. Agents believe that in this call, VAUGHN expressed his desire to have the package of heroin sent out. After FRYE told VAUGHN that GRACIANI ("Berto") was not available, VAUGHN asked FRYE whether FRYE had anyone else who could assist FRYE in packaging the drugs ("you ain't got nobody to wrap that thing")

27

and pushed FRYE to do it himself if necessary ("you act like you handicapped ... like you can't do it"). Ultimately, FRYE agreed to see if PINA ("Milk") was available.

50. Later on September 20, 2010, VAUGHN called FRYE twice on Target Telephone #2 to determine whether FRYE had spoken with GRACIANI ("Berto"). In the second of those calls, FRYE explained to VAUGHN that GRACIANI said he was going to call "when he got there," and "soon as he's done, I'm just going to go snatch it back up." FRYE told VAUGHN, "So I can get it gone ... if it's not gone today, it'll be gone tomorrow." VAUGHN gave some additional instructions to FRYE: "Get me an express box but you don't got no tracking number. My main thing is have, that why the overnight shit is the best because it's through there ... I got the tracking number, boom, I can check right there, alright this shit is there." VAUGHN urged FRYE, "just try and get it together today, man, that way I can you know bring this. I can get that shit out in the mail before noon time tomorrow." Later in the call, VAUGHN told FRYE, "Got all the information but I am going to wait until you ready for all that. Cause I know right now you just trying to put the thing together." VAUGHN asked FRYE, "Who you going to have, him wrap the thing up?" FRYE responded, "I'm just going to do, I'm just have him wrap that up man." VAUGHN recommended, "Have someone else do it from there ... after that." VAUGHN advised FRYE, "Give it to him and tell

him I'll call him because he got to do it a specific way.  He
can't do it same time like last time so."

51.  Agents believe that in this call, FRYE advised VAUGHN
that he was waiting to hear from GRACIANI, that he was going to
get the heroin from GRACIANI to send, and that the heroin would
go out either that day or the next.  VAUGHN told FRYE that he had
the mailing information, but that he was waiting to provide that
information until FRYE was ready.  VAUGHN then discussed with
FRYE who was going to wrap the heroin, and urged FRYE to have
someone other than GRACIANI actually ship the heroin.  VAUGHN
further advised FRYE that the heroin needed to be wrapped in a
certain manner so that it would not be detected as had occurred
last time, and that VAUGHN, during a subsequent call, would
explain how the heroin should be wrapped.

52.  On September 21, 2010, at approximately 12:20 p.m.,
FRYE used Target Telephone #2 to call PINA at 508-685-9691, which
is subscribed to in the name of Elizabeth Pina, 215 Fresh Pond
Road, East Falmouth, MA (hereinafter "PINA Telephone #1").[11]

---

[11] Agents working on the investigation identified PINA as
the speaker in intercepted wire communications based upon various
factors including, but not limited to, the following:  First,
there were numerous intercepted calls between PINA and FRYE in
which PINA made statements concerning his location that were
consistent with ongoing physical surveillance.  Second, in
another intercepted conversation with PINA, FRYE referred to
being at "your house," and ongoing surveillance indicated that
FRYE was at PINA's house.  Third, the address for the listed
subscriber of PINA Telephone #1 is 215 Fresh Pond Road, East
(continued...)

FRYE told PINA, "You got to get that thing done for T today yo."
PINA responded, "Alright what time you gonna be around?"  FRYE
answered, "I'm down here now nigga.  I just got to do a few
things."

53.  Later on September 21, 2010, agents intercepted another
call placed by FRYE using Target Telephone #2 to PINA.  During
this call, PINA asked FRYE, "I didn't know if it was tuck or
swallow ... do you know?"  FRYE responded, "It's got to be
swallow, yo, most likely.  I'm not even sure."  PINA responded,
"Oh man ... that makes all the difference in the world how you do
it."  FRYE responded, "I don't know nigga.  I have no idea.  I
was, I was thinking it would be swallow."  Agents believe that in
this conversation PINA asked FRYE what method the courier was
going to use to deliver the drugs into the prison ("tuck or
swallow").

54.  On September 21, 2010, at approximately 2:28 p.m., FRYE
received a call on Target Telephone #2 from telephone number
602-214-1161, and FRYE spoke with VAUGHN.  During that
conversation, VAUGHN asked FRYE, "You gonna be able to make the
post office?"  FRYE responded, "I'm not sending out it out,
nigga, I gotta find someone to do that shit."  Later, FRYE
stated, "I'm tryin' to get a hold of Albert, cause I know that

---

[11](...continued)
Falmouth, MA, which is PINA's known residence (hereinafter
referred to as "PINA's Residence").

dumb nigga would do it." VAUGHN asked, "What time do you think you'd have it done by, cause I might be able to find somebody by, you gotta be done, bro." FRYE responded, "Nigga, I should be done in two seconds, nigga, that's nothing. I already talked to Stefan. He gonna do it right now." FRYE said, "He knows what the fuck he needs. I told him to go into the store and grab it." VAUGHN told FRYE, "Tell that nigga Milk to do that shit - stop being scared man. Shit ain't even heavy man." VAUGHN emphasized to FRYE, "Tell him I need ... two things, make sure one, you get the tracking number and two, it doesn't have to be signed for at the destination."

55. Agents believe that in this call, FRYE and VAUGHN discussed the logistics of sending the drugs. FRYE told VAUGHN he was trying to get in touch with another individual ("Albert") to do the mailing. FRYE advised that PINA ("Stefan") was to go to the store and get the package to ship the drugs. VAUGHN instructed FRYE to tell PINA ("Milk") not to be afraid of getting caught.

56. Shortly after this call, at approximately 2:37 p.m., FRYE used Target Telephone #2 to call PINA at telephone number 508-457-9757 (hereinafter "PINA Telephone #2"), which is subscribed to in the name of Elizabeth PINA, 215 Fresh Pond Road, East Falmouth, MA. FRYE asked PINA whether he had money so that they could "grab what we need." After PINA asked what did they

31

need, FRYE replied, "The shit for T." PINA stated, "Do I have money to grab that? ... Um, yeah, I can get it. I don't know where to get it though but I can get it." FRYE answered, "CVS."

57. At approximately 3:34 p.m., FRYE received a call on Target Telephone #2 from PINA, who told FRYE that he was with "Albert and Danny." FRYE responded affirmatively when PINA then asked FRYE whether he needed Albert.

58. At approximately 4:20 p.m., agents conducting physical surveillance observed a gray Ford Expedition bearing Massachusetts registration 1BA850 (hereinafter, the "PINA Vehicle") traveling toward the Mashpee Commons shopping center in Mashpee, MA. The agents observed PINA operating the PINA Vehicle, with FRYE as a passenger seated in the rear.

59. Agents followed the PINA Vehicle to a CVS located within the Mashpee Commons. At approximately 4:23 p.m., agents observed FRYE and PINA park the PINA Vehicle, exit it, and enter the CVS. At that point, agents identified two other occupants ("Albert" and "Danny") who remained in or near the PINA Vehicle.[12]

60. At approximately 4:30 p.m., FRYE and PINA exited the CVS pharmacy. Agents observed PINA carrying a plastic shopping bag that appeared to contain a small blue box. Agents also

---

[12] Because neither of these individuals are being charged at this time, I am not identifying either by their last name.

observed FRYE carrying what appeared to be a receipt.  Frye and
PINA then returned to and entered the PINA Vehicle.

61.  At that point, surveillance agents observed four
individuals in the PINA Vehicle.  PINA was seated in the driver's
seat.  "Albert" was seated next to PINA in the front passenger
seat.  FRYE was seated in the back seat behind PINA.  "Danny" was
seated in the rear passenger seat behind "Albert."

62.  Agents then observed the following events: PINA handled
the blue box that he had previously carried in the CVS shopping
bag.  PINA passed the blue box over his shoulder to one of the
two rear seat occupants.  At the time, FRYE was seated in the
back seat of the PINA Vehicle, with his back facing toward the
driver's side rear window.  FRYE manipulated an unidentified item
in his hands while facing the other rear-seat passenger.  Both
PINA and "Albert" turned to look over their shoulders at FRYE and
"Danny," the other passenger in the rear of the PINA Vehicle.

63.  Agents followed the PINA Vehicle as it left the CVS
parking lot at approximately 4:30 p.m.  The PINA Vehicle
proceeded to a United States Post Office located within the
Mashpee Commons at 11 Market Street, Mashpee, MA.  PINA parked
the PINA Vehicle at the back of the Post Office.

64.  At approximately 4:40 p.m., agents observed "Albert"
enter the Post Office through the side door, carrying a blue box
that appeared identical to the blue box previously in PINA's

possession.  A surveillance agent followed "Albert" inside the Post Office, where "Albert" approached the counter.  The agent overheard "Albert" providing a clerk with a zip code that he appeared to be reading from a piece of paper in his hand.

65.  The surveillance agent later observed "Albert" leave the counter area and proceed toward the side door.  The agent then saw "Albert" walking back to the PINA Vehicle, which then left the area.

66.  Agents returned to the Post Office and retrieved the package.  The package was addressed to "Attica Smart, 3265 S.W. 49th, Oklahoma City  73119," and bore a return address of "Branon Rezades, 2 Main Street, East Falmouth, MA  02540."  On September 22, 2010, agents obtained a federal warrant from a Magistrate Judge in the District of Massachusetts authorizing them to search the package.  (No. 10M-1141-JGD).  The package contained 11.1 grams of heroin in a purple balloon inside a Kung Zhu toy box.

C.    **September 28, 2010:  Agents Seized Approximately 200 Grams of Heroin and Arrested ARIAS**

67.  On Tuesday, September 28, 2010, based upon intercepted calls on Target Telephone #2, law enforcement seized approximately 200 grams of heroin following a traffic stop of a minivan driven by ARIAS.  Agents believe that the delivery of heroin was coordinated by GRACIANI and intended for delivery to FRYE.

68.  The events that resulted in this seizure began on
September 13, 2010.  On that date, interceptions of Target
Telephone #2 and physical surveillance indicated that FRYE,
HICKS, and PINA visited GRACIANI's residence and obtained heroin
from a supplier.

### 1.  September 13, 2010: FRYE, GRACIANI, PINA, and VAUGHN discussed a delivery of heroin

69.  On September 13, 2010, at approximately 10:59 a.m.,
FRYE received a call on Target Telephone #2 from the GRACIANI
Telephone, and FRYE spoke with GRACIANI.  In a portion of the
call that was partially unintelligible, GRACIANI indicated that
he had talked to "him" yesterday.  GRACIANI stated that he would
"try to call Sleepy's ass."  Then GRACIANI said that "he's gonna
bring one and a half."[13]  GRACIANI said that "they" had been at a
funeral.  GRACIANI then said he would try calling "him" in a
little while.

70.  On the basis of this and subsequent calls, agents
believe that GRACIANI told FRYE about his communications with a
heroin supplier.  In particular, when GRACIANI said "he's gonna
bring one and a half," agents believe that GRACIANI was referring
to 150 grams of heroin that the supplier would be transporting.
GRACIANI also told FRYE that he had tried or was going to try and

_____

[13]  Although the "line sheets" indicate that the words after
"he's gonna bring" were unintelligible, I have determined via
subsequent review of tape of the intercepted call that GRACIAINI
said "he's gonna bring one and a half."

reach HICKS ("Sleepy") to determine whether HICKS wanted any of the heroin.

71.  Later on September 13, 2010, at approximately 1:43 p.m., FRYE used Target Telephone #2 to call GRACIANI on the GRACIANI Telephone.  During the call, GRACIANI said he had just talked to "him."  FRYE asked whether he, i.e., FRYE, should come "down there."  GRACIANI said, "Ya, he's gonna come down."  FRYE said he would go there now so there would not be a delay.

72.  Agents believe that during this call, GRACIANI communicated to FRYE that he had spoken with his heroin suppliers, who were planning to make a trip down to the area ("Ya, he's gonna come down.").

73.  About one minute later, at approximately 1:44 p.m., FRYE used Target Telephone #2 to call PINA on PINA Telephone #1. During the call, FRYE said to PINA, "I'm gonna need you today." PINA asked what was the matter.  FRYE said, "I'm gonna need you to pick me up at the bridge yo.  I'm gonna have some good news today."  PINA agreed to get FRYE.

74.  Agents believe that during this call, FRYE arranged transportation to GRACIANI's house to pick up heroin.  Agents believe that FRYE indicated that he was looking forward to obtaining a fresh supply of drugs ("I'm gonna have some good news today").

75. On September 13, 2010, at approximately 2:20 p.m., FRYE used Target Telephone #2 to call PINA again on PINA Telephone #1. FRYE asked PINA to "meet me at mother fucking usual spot." PINA said he would be there in a minute.

76. On September 13, 2010, at approximately 3:15 p.m., surveillance agents observed a 2003 green Ford Windstar minivan, Massachusetts registration 991EN5, (hereinafter the "GREEN FORD WINDSTAR") pull into 950 Santuit Road, Marston Mills, MA (hereinafter "GRACIANI's Residence"). The GREEN FORD WINDSTAR was operated by a Hispanic male.[14]

77. At approximately 3:31 p.m., FRYE received a call on Target Telephone #2 from GRACIANI, who told FRYE that "he's over there at the crizzo." FRYE said he would go over there. GRACIANI said, "He's over there waiting. The only one that is over there I think. I don't know if Izzy's over there, but he's there." FRYE said he would call GRACIANI as soon as he got there.

78. Agents believe that during this call, GRACIANI said that the heroin supplier was at GRACIANI's Residence ("he's" at the "crizzo," which agents believe is slang for "crib" or "residence"). GRACIANI then said he did not know if an

---

[14] I know the identity of the male driver. However, because he is not being charged at this time, I am not identifying him in this affidavit.

individual named "Izzy" was there,[15] was there but reiterated
that the supplier was present ("he's there"). FRYE said he would
go there.

79. At approximately 3:50 p.m., surveillance agents
observed FRYE and PINA traveling in the PINA Vehicle towards
Route 28, coming from the direction of GRACIANI's Residence. At
approximately 3:54 p.m., surveillance agents observed FRYE and
PINA arrive in the PINA Vehicle at 264 Route 130 Main Street,
Mashpee, MA (hereinafter "FRYE's Father's Residence"). At around
the same time, surveillance agents observed JACKSON arrive at
FRYE's Father's Residence.

80. Based upon previously intercepted calls (which are
discussed later in this affidavit), agents believe that JACKSON
was present to sample the heroin, and that FRYE and PINA were
present to take possession of at least part of the 150 grams of
heroin that was being delivered by the driver of the GREEN FORD
WINDSTAR.

81. At approximately 4:30 p.m., surveillance agents
observed HICKS arrive at GRACIANI's Residence where the GREEN
FORD WINDSTAR was still present. At approximately 4:44 p.m.,
agents observed HICKS leave GRACIANI's Residence. Roughly two
minutes later, at approximately 4:46 p.m., agents observed the

_____

[15] I know the identity of the individual referred to as
"Izzy"; however, because he is not being charged at this time, I
am not identifying him in this affidavit.

GREEN FORD WINDSTAR leave GRACIANI's driveway.  Agents believe
that the GREEN FORD WINDSTAR stayed at GRACIANI's Residence until
HICKS had picked up his share of the heroin.

82.  Agents followed the GREEN FORD WINDSTAR onto Route 28
and off Cape Cod.  Between 20 and 30 miles from GRACIANI's house,
a marked cruiser stopped the vehicle, based in part, upon a
traffic violation.  The driver of the vehicle, did not have a
valid Massachusetts driver's license, so he was arrested.
Meanwhile, the vehicle itself was towed.  While the vehicle was
in custody, a canine trained and certified to detect narcotics
alerted on several locations in the vehicle, and officers
examined those areas that were readily accessible.  Officers did
not find any drugs or money, but did notice an unusual
configuration underneath the front section of the vehicle (i.e.,
there appeared to be a piece of sheet metal welded to the bottom
center of the vehicle.)[16]  Officers believed that the positive
alerts were indication that drugs had recently been stored inside
the vehicle.  This belief is consistent with the subsequent
events of September 28, 2010, involving the seizure of
approximately 200 grams of heroin in the same GREEN FORD
WINDSTAR.

_____

[16]  Agents did not want the local police to conduct a more
fulsome search of the vehicle at this time as they hoped to
intercept a future delivery of heroin in the vehicle.  As will be
discussed, this took place on September 28, 2010.

83.    Later in the evening on September 13, 2010, at approximately 7:17 p.m., FRYE received a call on Target Telephone #2 from PINA.  During the call, PINA said, "Yeah, you hit the Mega Bucks there, kid.  You hear me?"  PINA then repeated the sentiment, and FRYE laughed.  PINA said, "Yup, [U/I], even me, man."

84.    Agents believe that during this call, PINA was communicating satisfaction with the quality of the heroin FRYE had just received.  PINA added that the quality satisfied his own exacting standards ("even me, man").[17]

---

[17]    Two days later, agents intercepted a call between FRYE and VAUGHN that corroborates this assessment.  At approximately 8:52 p.m. on September 15, 2010, FRYE received a call on Target Telephone #2 from VAUGHN Telephone #1.  In that call, FRYE and VAUGHN first discussed the September 9th intercepted package of heroin.  Next, they discussed the September 13th delivery of heroin.  FRYE told VAUGHN that "this one had had Big Nose about to puke . . . and my father's going crazy over this shit, this shit was crazy."  Later, FRYE repeated that "Nigga's big nose man, he like yoooooo, he was all fucked up yesterday."  FRYE then told VAUGHN, "Once motherfuckers heard about that boy, it was game over, game over nigga, 100 in two days nigga."

Agents interpret this call as confirming that the GREEN FORD WINDSTAR delivered heroin to FRYE on September 13, that PINA ("Big Nose") and FRYE's father both thought that the heroin was of high quality, and that after others learned of the heroin's quality, FRYE was able to sell 100 grams in two days ("once motherfuckers heard about that boy, it was game over, game over nigga, 100 in two days").

2.    <u>**September 28, 2010:  Approximately 200 grams of heroin was seized from ARIAS, who was in the process of making a delivery to GRACIANI and FRYE**</u>

85.  On September 28, 2010, agents intercepted telephone calls over Target Telephone #2 during which FRYE spoke with GRACIANI and PINA about what appeared to be another attempt to acquire drugs.  Agents reviewing a pen register on one of GRACIANI's telephones noticed that GRACIANI appeared to be in communication with the same phone number he had contacted during the earlier transaction, on September 13, 2010.  Then, on September 28, 2010, at approximately 11:38 a.m., Target Telephone #2 received a telephone call from GRACIANI.  GRACIANI told FRYE, "Yeah, I just talked with him.  One o'clock he'll be here.  He just left."

86.  As a result of this call, agents established surveillance at the Bourne Bridge, entering Cape Cod.  At approximately 12:57 p.m., agents observed the same GREEN FORD WINDSTAR that had delivered heroin to GRACIANI's Residence on September 13, 2010.  Based in part upon an observed traffic violation on Route 28 approximately one-half mile south of the Bourne Bridge, a Massachusetts State Police Trooper stopped the GREEN FORD WINDSTAR.  The driver of the vehicle, who identified himself as Joel ARIAS, gave oral consent to search the car.  Officers found approximately 200 grams of heroin and two digital scales in the previously-detected, concealed compartment inside

the vehicle.  ARIAS was arrested by the Massachusetts State
Police, and was released after posting $10,000 in bail.  A drug
charge remains pending against ARIAS in Barnstable County.

87.  Thereafter, at approximately 2:51 p.m., FRYE, using
Target Telephone #2, called GRACIANI, and asked GRACIANI,
"Where's the nigga at B?"  GRACIANI expressed surprise, asking
"They were there, they ain't there?  They ain't there?  He's not
there?"  After FRYE said no, GRACIANI said, "Let me call them
right now.  Hold on ..."

88.  At approximately 5:38 p.m., FRYE, using Target
Telephone #2, again called GRACIANI.  GRACIANI advised FRYE,
"their family looking for that nigga, he's, he said he was over
the bridge and nobody know, nobody know shit, father call me and
them and they trying to figure out right now."  FRYE responded,
"That nigger is in jail that's why ... You better tell nigga to
call police stations ...."

89.  Agents believe that in this call, FRYE and GRACIANI
discussed the fact that ARIAS, the heroin courier, had not yet
arrived with the heroin.  Agents believe that the reference to
"father" referred to GRACIANI's contact for ordering the heroin,
who had dispatched ARIAS to deliver the drugs.

D.  **September 29, 2010:  Agents Seized Approximately 100
    Grams of Heroin from GRAHAM and Arrested Him**

90.  On September 29, 2010, Delrico GRAHAM was arrested upon
being apprehended with approximately 100 grams of heroin during a

42

car stop.    Interceptions over the Target Telephone #4 indicate
that SLAYTON met with HICKS's supplier to obtain the heroin, and
that GRAHAM obtained the heroin from SLAYTON at the behest of
HICKS.

91.    On September 28, 2010, at approximately 7:34 p.m,
GRAHAM received a call on Target Telephone #4 from HICKS, who was
using telephone number 774-521-6963, subscribed to in the name of
Chris Rose, 123 Main Street, Falmouth, MA (hereinafter "HICKS
Telephone #2").[18]    HICKS asked GRAHAM, "Your girl, your girl
still got the car?"    HICKS told GRAHAM, "I might need a ride
tomorrow," and stated "I'll holler at you in the morning, yeah,
yeah."

92.    On September 29, 2010, at approximately 9:04 a.m.,
GRAHAM received a call on Target Telephone #4 from HICKS
Telephone #2.    HICKS asked GRAHAM if he had a ride.    GRAHAM said

---

[18]    Agents working on the investigation identified HICKS as
the speaker in these calls based upon various factors including,
but not limited to, the following:   First, during numerous calls
intercepted in 2010, HICKS made statements concerning his
location that were consistent with ongoing physical surveillance.
Additionally, agents recognize HICKS's voice based on recorded
jail calls from HICKS's prior incarceration.

Agents working on the investigation identify GRAHAM as the
speaker in intercepted wire communications based upon various
factors including, but not limited to, the following:   First, on
certain intercepted telephone calls attributed to GRAHAM, GRAHAM
or the other participant referred to GRAHAM as "Rico."   Second,
during numerous intercepted calls, GRAHAM made statements
concerning his location that were consistent with ongoing
physical surveillance.

he would call back to find out what was going on.  HICKS asked
GRAHAM to let him know "so I can call this guy and see what's up
with him."

93.  Based on this and subsequent calls, agents believe that
HICKS tried to recruit GRAHAM to run a drug-related errand for
him.  HICKS wanted to know whether GRAHAM could obtain a ride so
that he could call his supplier ("this guy") and make further
arrangements.

94.  On September 29, 2010, at approximately 9:05 a.m.,
GRAHAM used Target Telephone #4 to call telephone number
508-477-5796, a phone number subscribed to in the name of, and
used by, GRAHAM's girlfriend (hereinafter the "GRAHAM's
Girlfriend's Telephone").[19]  During the call, GRAHAM asked for a
ride.  GRAHAM's girlfriend said she could give him a ride after
her father's doctor's appointment at noon.  Over the next several
hours, GRAHAM and GRAHAM's girlfriend had several conversations
about the car ride.  The calls indicate that GRAHAM's girlfriend
ultimately picked up GRAHAM at approximately 1:30 p.m.

95.  At approximately 2:04 p.m., HICKS used HICKS Telephone
#2 to call GRAHAM on Target Telephone #4.  HICKS asked GRAHAM,
"Where the fuck you at?" and GRAHAM responded, "Your house."
Approximately one minute later, surveillance agents drove by

---

[19]  Agents know the identity of GRAHAM's girlfriend.
However, because she is not being charged at this time, I am not
identifying her in this affidavit.

HICKS's residence at 110 Raspberry Road, Marston Mills, MA, and observed GRAHAM walking from HICKS's house to GRAHAM's girlfriend's car.

96.    Thereafter, surveillance agents maintained continuous surveillance of GRAHAM from Cape Cod to the Boston area.    At approximately 4:10 p.m., HICKS again called GRAHAM on Target Telephone #4.    HICKS told GRAHAM, "Call my father" and gave GRAHAM the telephone number for HICKS's father, SLAYTON, "774-521-0336" (hereinafter the "SLAYTON Telephone").

97.    At approximately 4:12 p.m., GRAHAM used Target Telephone #4 to call HICKS, and GRAHAM confirmed the telephone number for SLAYTON.    Immediately thereafter, GRAHAM used Target Telephone #4 to call the SLAYTON Telephone.    GRAHAM informed SLAYTON that he was at the American Legion Highway.    SLAYTON told him to go to "the other spot."[20]

98.    Thereafter, at approximately 5:15 p.m., GRAHAM received a call on Target Telephone #4 from telephone number 404-769-2978, and GRAHAM spoke with an unidentified male (hereinafter "UM 2978").    During the call, GRAHAM said he was in Boston.    GRAHAM made a reference to "Sleepy."    UM 2978 asked if GRAHAM was able

_____

[20] Agents working on the investigation identify SLAYTON as the speaker in intercepted wire communications based upon various factors including, but not limited, to the following:    First, during an intercepted telephone call on Target Telephone #1, SLAYTON identified himself as "Greg."    Second, during numerous intercepted calls, SLAYTON made statements concerning his location that were consistent with ongoing physical surveillance.

to "get yourself something," and GRAHAM said no.  GRAHAM added,
"He cut that up, no it ain't, but he, he didn't tell nobody
what's going on. Told his father the same thing. I think, like,
he's cutting me off ... from grabbing something from him."  Later
in the conversation, GRAHAM said, "I'm not leaving without mine
tonight .... I ain't leaving without mine.  He's going to give me
something.  I'll just get a half of one."

99.  Agents believe that during this call, GRAHAM stated
that he was going to insist upon payment in drugs ("I'm not
leaving without mine tonight ... He's going to give me something
... I'll just get a half of one") in exchange for running a
drug-related errand for HICKS ("Sleepy").

100.  At approximately 5:25 p.m., GRAHAM received a call on
Target Telephone #4 from the SLAYTON Telephone, and GRAHAM spoke
with SLAYTON.  SLAYTON said that it should be 20 more minutes.
SLAYTON added that "he" just called.

101. Agents believe that SLAYTON told GRAHAM that HICKS or
HICKS's drug supplier ("he") had just called and that SLAYTON
would have the heroin in the next few minutes.

102. At approximately 6:08 p.m., GRAHAM received another
call on Target Telephone #4 from SLAYTON, who told GRAHAM he
would "be there" in about five minutes.  GRAHAM said he was
"here" waiting for SLAYTON.

103. At approximately 6:10 p.m., surveillance agents observed GRAHAM go inside a McDonald's restaurant.  GRAHAM walked immediately into the men's room.

104. At approximately 6:12 p.m., GRAHAM received another call on Target Telephone #4 from SLAYTON.  SLAYTON told GRAHAM, "Look for me.  I'll be pulling in about a minute, in a minute and a half."  At approximately 6:15 p.m., GRAHAM used Target Telephone #4 to call SLAYTON.  GRAHAM asked SLAYTON, "Where you at[?]"  SLAYTON replied, "I'm coming in."  GRAHAM answered, "Alright.  Come on inside.  I'm already inside."

105. Moments later, agents saw SLAYTON go into the same McDonald's restaurant and immediately go into the men's room. Approximately one minute later, surveillance agents watched SLAYTON leave the men's room and walk out of the McDonald's to his car.  The agents observed GRAHAM walk out of the men's room immediately behind SLAYTON.  GRAHAM stopped at a counter containing condiments, napkins, and cups before exiting the McDonald's and walking back to the vehicle.  Surveillance agents then followed GRAHAM's girlfriend's car as it headed back towards Cape Cod.

106. In Plymouth, a Massachusetts State Police Trooper made a traffic stop of GRAHAM's girlfriend's car, in part, for speeding and equipment violations.  As the Trooper approached the car, he saw the passenger, GRAHAM, quickly moving about the

interior of the car, reaching toward the center console area and then toward the back seat area.  The Trooper asked the driver, GRAHAM's girlfriend, for a license.  GRAHAM's girlfriend produced an expired driver's license.  The Trooper next asked GRAHAM why he was moving and reaching around so much as the officer approached the vehicle.  GRAHAM initially had no answer, and later added that he was reaching for his seatbelt.

107. The Trooper ordered GRAHAM's girlfriend and GRAHAM from the car, whereupon he observed a tightly-wrapped, tan-colored plastic bag stuffed in a McDonalds' soda cup.  The Trooper removed the bag from the soda cup and unwound it to discover ten tightly compacted tan chunks wrapped in wax paper.  Subsequent laboratory testing determined that the items wrapped in wax paper were approximately 100 grams of heroin.

108. The Trooper showed GRAHAM what he had located and asked GRAHAM if the heroin was his.  GRAHAM stated that it was, and that GRAHAM's girlfriend had nothing to do with it.  At that point, the Trooper arrested GRAHAM.  A Plymouth County drug charge remains pending against GRAHAM.

### E.    November 17, 2010: Agents Seized Approximately Two Kilograms of Cocaine and Approximately $75,000 in Cash at ROSE's Residence

109. The events giving rise to the arrest of ROSE, FORD, FRYE, and ANDREWS took place on November 16 and 17, 2010, and are based upon intercepts over ROSE's phone (Target Telephone #7).

48

Court-authorized interception of Target Telephone #7 revealed
that on November 16, 2010, ROSE negotiated to purchase two
kilograms of cocaine from FORD.[21]  During those negotiations,
ROSE contacted FRYE, who agreed to participate with ROSE in
buying the two kilograms of cocaine from FORD.  Surveillance and
intercepted telephone calls established that FRYE provided at
least $28,000 to ROSE on November 16, 2010, for the purchase of
the cocaine.  Additional intercepted telephone calls on November
16, 2010, revealed that ROSE contacted ANDREWS and made
arrangements for ANDREWS to hide the cocaine in the woods the
next day.[22]

---

[21]  Agents working on the investigation identified Ford as
the speaker in intercepted wire communications based upon various
factors including, but not limited to, the following:  Agents
conducting surveillance on November 16, 2010, identified FORD as
the driver of a vehicle.  The movements of that vehicle while
under surveillance were consistent with the intercepted telephone
conversations.  Additionally, agents conducting surveillance
observed FORD talking on the telephone at the same time that ROSE
was intercepted talking to FORD.  Moreover, in all of the
intercepted conversations with ROSE on that day, FORD used the
same telephone when speaking with ROSE.

[22]  Agents working on the investigation identified ANDREWS
as the speaker in intercepted wire communications based upon
various factors including, but not limited to, the following:
First, during numerous intercepted calls, ANDREWS made statements
concerning his location that were consistent with ongoing
physical surveillance.  Second, during intercepted
communications, individuals speaking with ANDREWS referred to
ANDREWS by his first name.  Third, ANDREWS agreed to an interview
with law enforcement agents in which the interviewing agent
verified that the voice being attributed to ANDREWS was in fact
ANDREWS's voice.

110. In part on the basis of these intercepted communications and concurrent surveillance by law enforcement agents, ROSE and FORD were arrested on November 16, 2010, while both were at ROSE's home at 35 Woodland Parkway, Randolph, Massachusetts (hereinafter "ROSE's Residence"). A search of ROSE's Residence was conducted on November 17, 2010, pursuant to a federal search warrant, and resulted in the seizure of, among other things, two individually-wrapped packages. Each seized package weighed more than one kilogram and contained white powder that subsequent laboratory testing confirmed was cocaine. Agents also seized more than $75,000 in currency.

V.    **OTHER DELIVERIES AND ATTEMPTED DELIVERIES OF DRUGS TO AND FROM THE DRUG-TRAFFICKING ORGANIZATION**

A.    **September 1, 2010:  Delivery of Heroin to GRACIANI and FRYE**

111. On August 31, 2010, at approximately 6:00 p.m., FRYE spoke to VAUGHN over Target Telephone #2.  VAUGHN asked FRYE what was going on.  FRYE told VAUGHN that he had "talked to them niggas man, these niggas said they're looking for it.  Right now.... They got it, but, but they already told me it's not the thing I want.  So they ain't gonna bring it to me.  So say, they said by tomorrow at the latest."

112. Agents believe that in this call, FRYE told VAUGHN that he had placed an order for heroin with a supplier ("niggas"), who was looking for heroin for FRYE.  FRYE told VAUGHN that the

supplier had heroin, but not the quality that FRYE was seeking

("it's not the thing I want").  FRYE advised VAUGHN that his

source told FRYE that the right quality heroin would be located

by the next day.

113. On September 1, 2010 at approximately 11:51 a.m., FRYE

used Target Telephone #2 to call PINA.  FRYE told PINA that he

was in Wareham.  PINA asked FRYE where "the dude at" and whether

FRYE was "messing with him at all today."  FRYE answered "Yeah.

I, I haven't talked to the nigger.  I already ordered some

anyway, so soon as soon I can get down there, hopefully it's down

there by the time I get down there."  PINA responded, "Ahh shit

man, I don't want to miss this fucking [unintelligible]."  PINA

asked FRYE whether he needed a ride, and FRYE answered

affirmatively.  FRYE told PINA, "Worse comes to worse worst,

you'll go right to Sleep man.  I'll watch your kids for a second

while you all go grab it."

114. Agents believe that in this call, FRYE advised PINA

that he had placed an order for heroin that FRYE hoped would be

at the Cape by the time he arrived.  PINA expressed interest in

obtaining part of this heroin shipment for himself.  FRYE told

PINA that if FRYE's supply of heroin did not arrive by the time

FRYE got down to the Cape, PINA could go to HICKS ("Sleep") to

pick up the heroin ("it") while FRYE watched PINA's children.

115. Later that afternoon, at approximately 1:48 p.m., FRYE received a call on Target Telephone #2 from GRACIANI. GRACIANI advised FRYE that "this dude called ... today ... [unintelligible] with that thing. And they [unintelligible] they were coming today." GRACIANI informed FRYE, "They be straight with that yeh meen." FRYE responded, "Yeah, tell them to bring it." GRACIANI then asked FRYE, "What's you want – a hundred, hundred ... fifty?" FRYE answered, "Yeah, hundred." GRACIANI told FRYE, "I'll call them right now."

116. Agents believe that in this second call, GRACIANI advised FRYE that GRACIANI had received a call from his heroin supplier ("this dude"), who was coming to make a delivery that day  GRACIANI told FRYE that heroin was available ("straight with that yeh meen"), and asked FRYE whether he wanted 100 or 150 grams. FRYE told GRACIANI that he wanted 100 grams.

117. At approximately 4:15 p.m., FRYE received a phone call on Target Telephone #2 from PINA. PINA told FRYE that he was going to head in FRYE's direction in order to meet with FRYE. FRYE told PINA to wait until FRYE could determine "what this niggas doing." Roughly a minute later, Target Telephone #2 called PINA Telephone #1. An unidentified individual told PINA, "We're over here." PINA indicated that he was "coming right now."

52

118. At approximately 4:35 p.m., surveillance agents observed a green Toyota pickup truck bearing Massachusetts registration 786DN9, which was registered to GRACIANI (hereinafter, "GRACIANI Vehicle #2") pull into 242 East Falmouth Highway, East Falmouth, MA (hereinafter "FRYE's Mother's Residence").  Surveillance agents observed FRYE and GRACIANI exit GRACIANI Vehicle #2.

119. Over the next hour, beginning at approximately 4:42 p.m., surveillance agents observed PINA, FRYE, GRACIANI, and other unknown individuals meet in the driveway of FRYE's Mother's Residence.  Subsequent calls the next day confirmed agents' belief that FRYE received a shipment of heroin.

**B.   September 9, 2010:  FRYE's Rejection of a Heroin Shipment Intended for FRYE, GRACIANI, and HICKS**

120. At approximately 2:03 p.m. on September 9, 2010, FRYE used Target Telephone #2 to call PINA on PINA Telephone #1.  FRYE told PINA, "I'm about to make something happen today ...."  FRYE told PINA that he might need a ride.  FRYE advised PINA, "I'll hit you back in a minute though.  I'm going to call this nigger see where he is at."  Agents believe that in this call, FRYE told PINA that he was trying to obtain heroin that day ("make something happen") and that he was going to check with his source.

121. Approximately one minute after concluding this call, FRYE used Target Telephone #2 to call the GRACIANI Telephone, and

FRYE spoke with GRACIANI.  FRYE asked GRACIANI where he was, and GRACIANI replied that he was at home.  FRYE told GRACIANI that he was going to stop by and asked GRACIANI, "Yo, you talk to that nigger?"  FRYE then asked GRACIANI, "You want me to ah bring that to you now, so [unintelligible] they can have it when they get there?"  GRACIANI replied, "It's up to you.  I don't care."

122. Agents believe that in this call, FRYE asked GRACIANI whether GRACIANI had spoken with his heroin source ("that nigger").  FRYE then asked GRACIANI whether GRACIANI wanted FRYE to bring money to GRACIANI ("bring that to you now") so that he could give the money to the heroin source.

123. At approximately 2:08 p.m., FRYE received a call on Target Telephone #2 from GRACIANI.  FRYE told GRACIANI that FRYE was going to stop by GRACIANI's house.  Roughly 20 minutes later, at approximately 2:30 p.m., FRYE received another call on Target Telephone #2 from GRACIANI.  GRACIANI asked FRYE, "When you coming[?]  Cause the people's here."  GRACIANI also asked FRYE, "Where's Sleep at?"  FRYE told GRACIANI, "I'll be at your house in two seconds."

124. Agents believe that in this second call, GRACIANI informed FRYE that the heroin supplier was at GRACIANI's home.  GRACIANI also inquired about HICKS's ("Sleep") whereabouts.

125.  Immediately after hanging up with GRACIANI, FRYE used Target Telephone #2 to call PINA, and instructed PINA to pick him up.

126.  FRYE received another call on Target Telephone #2 from GRACIANI at approximately 2:54 p.m.  FRYE told GRACIANI that he was en route.  GRACIANI asked FRYE, "You call Sleepy already?" which agents believe was an inquiry whether FRYE had notified HICKS ("Sleepy") that a heroin shipment had arrived.

127.  At approximately 3:01 p.m. on September 9, 2010, agents conducting physical surveillance observed FRYE and PINA arrive in the PINA Vehicle at GRACIANI's Residence.  FRYE and PINA were at GRACIANI's Residence for approximately 20 minutes.  At approximately 3:24 p.m., surveillance agents watched FRYE and PINA leave GRACIANI's Residence in PINA's Vehicle.  At approximately 3:26 p.m., approximately two minutes after FRYE and PINA left GRACIANI's Residence, surveillance agents observed the GREEN FORD WINDSTAR leave GRACIANI's residence.

128.  Surveillance agents followed FRYE and PINA, who drove directly from GRACIANI's Residence to FRYE's Father's Residence. Shortly after FRYE and PINA arrived at FRYE's Father's Residence, surveillance agents observed JACKSON leave FRYE's Father's Residence driving a black Mercedes with dealer plates.

129.  At approximately 5:33 p.m. on September 9, 2010, FRYE used Target Telephone #2 to call his father, and said, "I tried

to make somethin' happen for us, but them mother fuckers brought down some bullshit, so I had to send it back.... Ya so, but I was down there, I had it in my hand and everything. Rick, Rick, Rick said there was better stuff around here. So I told them to take that shit back - give me something better. Yeah, so they said tomorrow."

130. Agents believe that in this call, FRYE told his father that he had tried to buy drugs that day ("make somethin happen to us") but that the drugs that had been delivered were of such poor quality ("bullshit") that he had to return them. FRYE said that JACKSON ("Rick") said that better quality heroin was readily available elsewhere ("better stuff around here"), so FRYE returned the heroin ("told them to take that shit back"). FRYE stated that a new delivery of heroin was expected the next day.

131. At approximately 5:37 p.m., FRYE used Target Telephone #2 to call PINA. PINA asked FRYE, "What did them boys tell you? They gonna freshen it up?" FRYE answered, "I didn't even call them nigga yo." PINA persisted, "No, when you gave it back to them." FRYE replied, "They didn't say shit nigga. They just took it back nigga." PINA responded, "Oh they didn't tell you - they'll be back tomorrow." FRYE stated, "That's what he said."

132. Agents believe that this call confirmed what FRYE told his father earlier - namely, that FRYE gave the drugs back and a delivery of "fresh" drugs was expected the next day.

133. The next day, September 10, 2010, at approximately 1:13 p.m., FRYE used Target Telephone #2 to call GRACIANI on the GRACIANI Telephone. FRYE asked GRACIANI, "That nigger didn't call back?" GRACIANI said no. GRACIANI stated, "Nigger said he'd come back, if they have it. Other shit will come through." FRYE urged GRACIANI, "Well hit up man. Shit, he probably been calling you. Hit him up."

134. Agents believe that, in this call, FRYE called GRACIANI to inquire the status of a replacment batch of heroin. GRACIANI reminded FRYE that the heroin supplier ("nigger") said he would return if he had heroin available ("he'd come back if they have it"). FRYE encouraged GRACIANI to call the source ("hit him up").

135. Later that same day, at approximately 3:27 p.m., FRYE received a call on Target Telephone #2 from GRACIANI, and GRACIANI advised FRYE, "These niggers, they never, they never picked up. So [unintelligible], they'll probably call me. I already called them four times."

## VI. Additional Drug Transactions Involving BEARSE, MCGEE-BAKER, GILSON, HICKS, JACKSON, and WOBECKY

136. In addition to the five drug seizures and three transactions discussed above, other intercepted wire communications and surveillance provide evidence concerning the roles of BEARSE, MCGEE-BAKER, GILSON, HICKS, JACKSON, and WOBECKY

in the drug trafficking organization headed by ROSE, FRYE, HICKS, and GRACIANI.

A.   **BEARSE and MCGEE-BAKER**

137.  During the investigation, agents determined that BEARSE was a manager at the BRIARWOOD Condominium Complex on Gifford Street in Falmouth, Massachusetts.  BEARSE was intercepted on Target Telephone #6 and Target Telephone #7 in calls with MCGEE-BAKER and with ROSE discussing cocaine that she received from them for resale.

1.   **November 6, 2010:  BEARSE obtained 7 grams of cocaine from MCGEE-BAKER**

138.  On November 6, 2010, at approximately 4:51 p.m., MCGEE-BAKER received a call on Target Telephone #6 from 508-274-3257 (hereinafter the "BEARSE TELEPHONE"), who identified herself as "Bonnie," and asked MCGEE-BAKER, "Do you have product?"[23]  BEARSE

---

[23] Agents working on the investigation identified MCGEE-BAKER as the speaker in intercepted wire communications based upon various factors including, but not limited to, the following:  First, during numerous intercepted phone calls, MCGEE-BAKER made statements concerning his location that were consistent with ongoing physical surveillance.  Second, individuals have been intercepted calling MCGEE-BAKER by the nickname "Bake."

Agents working on the investigation identified BEARSE as the speaker in intercepted wire communications based upon various factors including, but not limited to, the following:  First, the BEARSE TELEPHONE is subscribed to BEARSE.  Second, BEARSE identified herself in calls as "Bonnie," and ROSE referred to her as "Bonnie."  Third, Rose told MCGEE-BAKER that Bonnie stayed at Unit 31, which agents confirmed during the investigation. Fourth, the voice-mail on the BEARSE Telephone says, "This is

(continued...)

then clarified, "do you any white on you?"  After MCGEE-BAKER responded affirmatively, BEARSE said, "I need you to do me a favor though.  I don't have cash to give out cause I'm getting this for someone.  I need um, two basketballs... You know what I mean.  I need you to bring them to me and then when I collect the money I'll call you and you can come pick it up.  I just don't have the cash on me now."  MCGEE-BAKER indicated that he was going to be dropped at his car in ten minutes and that he would then would call BEARSE.  BEARSE replied, "Alright and then you can come over here.  I don't have my car either."  BEARSE informed MCGEE-BAKER, "I'm in 31, 31."

139. Agents believe that in this call, BEARSE asked MCGEE-BAKER if he had drugs ("product") and specified that she sought two, one-eighth ounce packages ("two basketballs") of cocaine ("white").  BEARSE advised MCGEE-BAKER that she was ordering the drugs for another individual and would not be able to pay MCGEE-BAKER until she herself was paid.  BEARSE, who was at the time working at the Briarwood Condominium Complex, indicated that she was in Unit 31.  Agents have confirmed that BEARSE occupied Unit 31 at the Briarwood Condominium Complex.

140. At approximately 6:37 p.m. that same day, MCGEE-BAKER called BEARSE using Target Telephone #6.  BEARSE reminded

---

[23](...continued)
Bonnie."  Finally, I have interviewed BEARSE and recognize her voice.

MCGEE-BAKER that she was in "thirty-one ... in unit thirty-one."
BEARSE then asked MCGEE-BAKER if he was there.  MCGEE-BAKER
apologized to BEARSE, explaining that "I'm about to be there
cause I left my phone in a girl ... in a person's car there that
gave me a ride to my car, and they already, they went to work, so
I had to get a ride over there, know what I mean?"  MCGEE-BAKER
told BEARSE that he would be there in about ten minutes,
explaining that he first had to stop at "Hong Kong real quick and
see somebody, and then I'll [unintelligible] drop
[unintelligible] off and I'll be right over there."

141. Agents believe that MCGEE-BAKER delivered the drugs as
planned as there were no further calls between BEARSE and
MCGEE-BAKER that night.

2.    **November 14, 2010:  BEARSE received 14 Grams of**
      **cocaine from MCGEE-BAKER at ROSE's direction**

142. At approximately 3:35 p.m. on November 14, 2010, BEARSE
called ROSE on Target Telephone #7 and asked, "any word on my
blueberries?"  ROSE responded, "There's nothing ... I'm just
figured I just gonna hit you with the other thing."  BEARSE
replied, "as long as it's decent cuz I got - what?"  BEARSE told
ROSE that she would be at "the office till five o'clock."  BEARSE
further stated, "Cause I'm gonna sell it to bring back the cash."

143. Based upon this and subsequent calls, agents believe
that BEARSE asked for some unidentified type of drugs
("blueberries").  ROSE then indicated that the drugs BEARSE

sought were not available, and that he would provide BEARSE with cocaine instead.  BEARSE stated that she planned on selling the cocaine she received.

144. Later that evening, at approximately 7:12 p.m., ROSE received a call on Target Telephone #7 from BEARSE.  BEARSE asked whether ROSE was "still playing basketball," which agents believe was an inquiry about the status of her anticipated receipt of cocaine from ROSE.

145. The very next call placed by ROSE on Target Telephone #7 at 7:20 p.m. was to MCGEE-BAKER on Target Telephone #6.  ROSE instructed MCGEE-BAKER that, "I need you to go by and see Bonnie right quick for me."  ROSE told MCGEE-BAKER to "bring 14 and tell her, tell her it's 20.  Yo, all rock, all rocks, I don't want no powder in that shit ... but but but break the rocks all up in like little tiny pieces ... so that it looks crazy big and tell her 'it's 20, yo.'"  MCGEE-BAKER advised ROSE, "[unintelligible] go grab it.  I don't even got all that on me right now."  MCGEE-BAKER verified, "But she's [unintelligible] spot though?"  ROSE answered, "Ya, she's at in the office, yo.  Just, just put ma ... all rocks, don't give her no powder."

146. Agents believe that in this call, ROSE instructed MCGEE-BAKER to deliver 14 grams of cocaine to BEARSE but to make it appear that what MCGEE-BAKER was providing to BEARSE was a larger quantity of cocaine ("so that it looks crazy big").  ROSE

further instructed MCGEE-BAKER to tell BEARSE that he was
delivering 20 grams of cocaine ("bring 14 and tell her, tell her
it's 20"). MCGEE-BAKER said that he would do so, but that he
needed to pick up more cocaine as he did not have that quantity
at the moment ("I don't even got all that on me right now").
MCGEE-BAKER further sought confirmation that BEARSE was at the
Briarwoods Condominium Complex ("spot"). ROSE confirmed that she
was ("she's at in the office").

147. At approximately 8:08 p.m., MCGEE-BAKER used Target
Telephone #6 to call ROSE on Target Telephone #7. In the call,
MCGEE-BAKER asked, "You say she's in the office ..." ROSE
responded, "She should be in the office, if not check 31."
MCGEE-BAKER replied, "Alright I'm walking up right now."

148. Immediately after hanging up, ROSE used Target
Telephone #7 to call MCGEE-BAKER on Target Telephone #6. ROSE
instructed MCGEE-BAKER, "Ya don't even say, just be like, 'yo
Russ told me to bring this to you.' That's it, you don't even
tell her what it is."

149. Roughly two minutes later, at approximately 8:11 p.m.,
BEARSE called ROSE on Target Telephone #7 and said, "I was
surprised to see my other friend. But thank you. Um, do you
know what that even weighs out at? Or – we'll talk at some other
point? ... Do you know what that was that he brought? Did you

62

give him a number or what is that – that's a lot!"  BEARSE advised ROSE, "I'll figure, I got a scale, I'll weigh it."

150. Agents believe that BEARSE, in this call, expressed surprise that it was MCGEE-BAKER ("my other friend"), who delivered the cocaine, and not ROSE.  BEARSE also expressed gratitude for the large quantity of cocaine delivered by MCGEE-BAKER ("Did you give him a number or what is that – that's a lot!").  BEARSE inquired about the weight of the cocaine delivered by MCGEE-BAKER, and then stated that she would determine it herself as she had a scale.

**B.    GILSON and MCGEE-BAKER**

151. There were several intercepted calls involving GILSON, including two separate series of intercepted telephone calls discussed below.  First, there was a series of intercepted calls discussing GILSON's efforts to obtain 14 grams of cocaine on November 10, 2010 from MCGEE-BAKER.  Second, there was a series of intercepted calls discussing GILSON's efforts to obtain 7 grams of cocaine from ROSE on November 13, 2010.  Physical surveillance on November 10, 2010, revealed that GILSON met with MCGEE-BAKER to purchase the 14 grams of cocaine, and physical surveillance on November 13, 2010, revealed that GILSON met with ROSE to purchase the 7 grams of cocaine.

1. __November 10, 2010:  GILSON bought 14 grams of__
   __cocaine from MCGEE-BAKER__

152. On November 10, 2010, at approximately 12:52 p.m.,
MCGEE-BAKER received a call on Target Telephone #6 from ROSE, who
was using 617-470-6051.[24]  ROSE told MCGEE-BAKER to "call the
white boy from Yarmouth [unintelligible] down there.  But he's on
the public transportation so call him."  MCGEE-BAKER responded,
"alright."

153. Immediately thereafter, at approximately 12:53 p.m.,
MCGEE-BAKER used Target Telephone #6 to call 508-360-7980
(hereinafter "the GILSON Telephone"), and MCGEE-BAKER spoke with
GILSON.[25]  MCGEE-BAKER asked GILSON whether he was on the way
down.  GILSON responded that he was in Yarmouth but that he was
catching the bus and would be down there.  MCGEE-BAKER instructed
GILSON to call when he got there.

154. Later, at approximately 2:40 p.m., MCGEE-BAKER received
a call on Target Telephone #6 from GILSON, who was using the

---

[24]  617-470-6051 is the telephone number for Target
Telephone #7; however, as of November 10, 2010, court
authorization had not yet been obtained to intercept calls on
that line.

[25]  Agents working on the investigation identified GILSON as
the speaker in intercepted wire communications based upon various
factors including, but not limited to, the following:  First,
during numerous intercepted phone calls, GILSON made statements
concerning his location that were consistent with ongoing
physical surveillance.  Second, the GILSON Telephone was
subscribed to in GILSON's name, and the subscriber address listed
was known in the past to be GILSON's home address.

GILSON Telephone.  GILSON advised MCGEE-BAKER that he was at Walmart.  MCGEE-BAKER instructed GILSON to "sit tight."  GILSON then asked MCGEE-BAKER, "You know what I want?"  After MCGEE-BAKER asked GILSON what he wanted, GILSON responded, "Fourteen." MCGEE-BAKER then told GILSON, "Just sit tight.  I'll be, I'll be over that way in a little bit."

155. Based upon subsequent calls and physical surveillance, agents believe that during this call GILSON told MCGEE-BAKER that he was at the Walmart located at the Falmouth Mall on Teaticket Highway and that GILSON wanted 14 grams of cocaine.

156. During the next hour, intercepted calls on Target Telephone #6 established that GILSON and MCGEE-BAKER spoke several times.  During those calls, GILSON and MCGEE-BAKER discussed potential meeting locations and changed the location several times due to concerns that police officers were present at their previously agreed-upon sites.  Ultimately, they agreed to meet in the vicinity of a "Hong Kong" restaurant.

157. At approximately 3:34 p.m., officers conducting surveillance observed ANDREWS operating a gray Dodge Stratus, bearing MA registration 251DD5, in the vicinity of a Hong Kong restaurant at the corner of Maravista Street and Teaticket Hwy. The officers identified MCGEE-BAKER as a passenger in the vehicle.  At approximately 3:36 p.m., the officers observed GILSON at the passenger side of this vehicle.  At approximately

3:38 p.m., the officers observed GILSON depart on foot and return to the vicinity of Shaws/Walmart.  ANDREWS and MCGEE-BAKER departed the area in the vehicle.

    2.    **November 13, 2010:  GILSON bought 7 grams of cocaine from ROSE**

158. On November 13, 2010, at approximately 1:17 p.m., ROSE used Target Telephone #7 to call GILSON on the GILSON Telephone. ROSE asked GILSON, "What did you want to do?"  GILSON replied, "7," and ROSE answered, "All right, yeah, let me get that together...."  GILSON stated that he would "have them drive me over there" after he finished eating.

159. Based upon this call and subsequent calls, agents believe that GILSON wanted to obtain 7 grams of cocaine from ROSE.

160. The very next call intercepted on Target Telephone #7 took place minutes later at 1:22 p.m. when ROSE called MCGEE-BAKER, and told MCGEE-BAKER that, "I need you to come to the garage and bring me five."  ROSE whispered during the call. MCGEE-BAKER appeared not to understand ROSE, so ROSE repeated, "Bring me five grams to the garage."  MCGEE-BAKER advised ROSE that he "only got a couple on me right now."  ROSE, still whispering, responded "Alright, yeah, just put it all in one though."

161. Agents believe that ROSE told MCGEE-BAKER to bring 5 grams of cocaine to a garage that ROSE rented at 536 Thomas B.

Landers Road, East Falmouth, MA ("the Garage"), which agents believe that ROSE needed to complete GILSON's order.

162. Thereafter, at approximately 1:45 p.m., ROSE used Target Telephone #7 to call 774-521-0016, and ROSE spoke with an unidentified male (hereinafter "UM 0016"). During this call, ROSE asked UM 0016, "what you tryin to do," and UM 0016 responded, "a quarter." Agents believe that in this call UM 0016 told ROSE he needed a quarter ounce of cocaine.

163. Immediately after hanging up with UM 0016, ROSE used Target Telephone #7 to again call MCGEE-BAKER on Target Telephone #6. In this call, which lasted approximately 30 seconds, ROSE told MCGEE-BAKER, "Bring me ... five grams and a quiz, separate."

164. Agents believe that in this call, ROSE modified his earlier instructions to MCGEE-BAKER concerning the cocaine that ROSE needed MCGEE-BAKER to deliver. After having just spoken with UM 0016 who wanted a "quarter," ROSE instructed MCGEE-BAKER to deliver 5 grams of cocaine for one customer (GILSON) and a quarter ounce of cocaine ("a quiz") for a second customer ("separate").

165. After this call, agents monitoring video from a pole camera outside the Garage observed three vehicles arriving at the location. Agents saw several individuals both known and unknown to me, including GILSON, at the location.

166. At 2:24 p.m., ROSE used Target Telephone #7 to call MCGEE-BAKER on Target Telephone #6. MCGEE-BAKER indicated that he was between ten and fifteen minutes away. ROSE urged MCGEE-BAKER to hurry: "I got these people sittin' here man, they're tryin to go ..."

167. At 2:51 p.m., ROSE used Target Telephone #7 to call MCGEE-BAKER again on Target Telephone #6, and ROSE urged MCGEE-BAKER to hurry up. At 3:02 p.m., ROSE, using Target Telephone #7, again called MCGEE-BAKER on Target Telephone #6. MCGEE-BAKER stated, "Hey I'm pullin in right now." Immediately after that call, agents monitoring the pole camera outside the Garage observed an individual who appeared to be MCGEE-BAKER meeting with ROSE.

### C.   HICKS and GRAHAM

#### 1.   September 18, 2010:  HICKS recruited GRAHAM to pick up drugs

168. On September 18, 2010, HICKS recruited GRAHAM to pick up drugs on his behalf. Although GRAHAM did not actually make the trip, the conversations and subsequent observations made during physical surveillance shed further light on the scope of the drug-trafficking conspiracy and aid in establishing the relationship between HICKS and ROSE.

169. On September 18, 2010, at approximately 11:28 a.m., GRAHAM received a call on Target Telephone #4 from HICKS, who was using HICKS Telephone #2. HICKS asked GRAHAM if he had a ride,

and GRAHAM said yes – Michelle.  HICKS asked when, and GRAHAM said a couple of hours.  HICKS said, "I need it like now, nigga, like sooner than that."  GRAHAM asked where, and HICKS said it was right up the road to the bridge.  GRAHAM asked: "Drop off, pick up?"  HICKS said yes.  GRAHAM said he would call back once he called "her."

170. Roughly fifteen minutes later, at approximately 11:42 a.m., GRAHAM received another call on Target Telephone #4 from HICKS Telephone #2, and spoke to HICKS.  GRAHAM asked HICKS what he needed to do.  HICKS said GRAHAM had to come to "the crib."  GRAHAM asked if he had to go see HICKS, and HICKS said yes.  GRAHAM asked, "And then run that way?"  HICKS said yes.  GRAHAM then asked, "Am I going to see somebody?"  HICKS said yes.  HICKS then asked if GRAHAM had a ride, and GRAHAM said he did.  HICKS told him to hurry up.

171. Agents believe that in these two calls, HICKS recruited GRAHAM to run an errand for HICKS.  Based upon later calls intercepted that same day as well as intercepted calls on other days (including the calls previously described at paragraphs 91-97 in which HICKS directed GRAHAM to meet with SLAYTON to pick up heroin), agents believe that HICKS directed GRAHAM to pick up drugs for, and deliver drugs to, HICKS.

172. Over the next hour, Graham, using Target Telephone #4, made a number of unsuccessful attempts to contact ROSE on Target Telephone #5.

173. At approximately 1:15 p.m., GRAHAM received another call on Target Telephone #4 from HICKS Telephone #2, and GRAHAM spoke with HICKS.  GRAHAM asked whether HICKS had talked to "that nigga."  HICKS said, "Yeah, Briarwood."  GRAHAM said that he, GRAHAM, had been running around waiting and now "she" wanted to go home.  HICKS said, "Oh, geez."  GRAHAM responded, "That's what he does, man....  That's what he had me do last night, being on hold two hours and not answering the phone at all."  GRAHAM added that he was back at his house with no ride.  HICKS said, "Oh, so what the fuck, you take the money, nigga, if you couldn't fucking."

174. Agents believe that during this call, GRAHAM asked if HICKS had talked to ROSE ("that nigga").  When HICKS responded by mentioning "Briarwood," agents believe that he was referring to the Briarwood Condominium Complex on Gifford Street in Falmouth, Massachusetts, where ROSE maintained an apartment.  Agents believe that at that point, GRAHAM backed out of his promise to pick up drugs on behalf of HICKS, citing GRAHAM's girlfriend's desire to go home.  GRAHAM then blamed ROSE for not answering the phone.  HICKS expressed displeasure with GRAHAM because GRAHAM

had taken HICKS's money, but was now unable to complete the deal on his behalf.

175. At approximately 1:54 p.m., GRAHAM received another call on Target Telephone #4 from HICKS Telephone #2, and GRAHAM spoke with HICKS.  HICKS asked GRAHAM where he was.  GRAHAM said he was home.  HICKS directed GRAHAM to come outside.

176. Based upon this call, agents believe that HICKS traveled to GRAHAM's house and summoned GRAHAM outside in order to retrieve the money for the drug transaction that GRAHAM was no longer able to participate in.

177. Surveillance agents then followed HICKS as he drove to the Briarwood Condominium Complex.  At approximately 2:05 p.m., surveillance agents observed HICKS turning into the complex.  At approximately 2:40 p.m., agents photographed ROSE in the parking lot of the condominium complex; however, from their vantage point, agents were unable to observe HICKS meeting with ROSE.

178. Agents believe that the above-described telephone calls and physical surveillance confirm that HICKS obtained the drugs that HICKS originally wanted GRAHAM to pick-up from ROSE.

## 2.    <u>September 18, 2010:  HICKS sold GRAHAM an eighth of an ounce of cocaine</u>

179. On September 18, 2010, at approximately 5:57 p.m., GRAHAM received a call on Target Telephone #4 from HICKS Telephone #2, and GRAHAM told HICKS that he was "trying to get a ball."  HICKS asked where GRAHAM was, and GRAHAM answered, "the

crib." GRAHAM asked HICKS how long he would be. HICKS answered
that "It all depends on how much money you got." GRAHAM first
said he had "150," but after being questioned by HICKS, said he
had "130." HICKS stated that he could not provide a ball for
130. GRAHAM then stated, "Let me try to get some more and I'll
call you back." They agreed to speak later.

180. Agents believe that in this conversation, GRAHAM
attempted to order an eighth of an ounce of cocaine ("a ball")
from HICKS. GRAHAM stated that he was at his house ("the crib"),
and offered $130 ("130") for the drugs. HICKS declined to carry
out the transaction at that time for that price.

181. Approximately one minute later, GRAHAM received another
call on Target Telephone #4 from HICKS Telephone #2. HICKS asked
GRAHAM, "You gonna be at your house?" GRAHAM said yes, and HICKS
responded that he will "be up that way" and that he was currently
in Mashpee.

182. Agents believe that in this call, HICKS changed his
mind and agreed to sell the cocaine to GRAHAM.

183. At approximately 6:02 p.m., GRAHAM, using Target
Telephone #4, called HICKS Telephone #2. GRAHAM asked HICKS,
"Can I meet you, can I make this quicker?" HICKS said no and
added that he would be right there.

184. Thereafter, GRAHAM spoke with HICKS two more times
urging him HICKS to hurry up. At approximately 6:28 p.m.,

72

surveillance agents observed HICKS arriving at GRAHAM's residence at 7 Hiacoombs Lane, Mashpee, MA. Three minutes later, surveillance agents observed HICKS leave GRAHAM's residence. Immediately thereafter, GRAHAM was intercepted placing an outgoing call on Target Telephone #4 to an individual who had previously been intercepted earlier that day seeking to purchase cocaine from GRAHAM. In that call, GRAHAM told this individual that he could "come on around and grab that from Mario." Based on prior and subsequent calls, agents believe that GRAHAM told this individual that he had left the cocaine (which GRAHAM had just received from HICKS) with GRAHAM's brother, Mario.

D.   **JACKSON**

185. JACKSON was intercepted consistently on Target Telephone #1 from June 12 through August 2, 2010.[26] Intercepted calls establish that JACKSON was a regular customer of ANDREWS, who negotiated numerous narcotics transactions over that time period with ANDREWS. Most of the drug transactions were for heroin. On one occasion described below, JACKSON purchased a gram of cocaine.

---

[26] Agents working on the investigation identified JACKSON as the speaker in intercepted wire communications based upon various factors including, but not limited to, the following: First, during intercepted communications, JACKSON identified himself by his first name, "Rick." Second, during numerous intercepted calls, JACKSON made statements concerning his location that were consistent with ongoing physical surveillance.

1.  **June 12, 2010:  JACKSON bought at least 5 grams of heroin From ANDREWS**

186. On June 12, 2010, at approximately 12:41 p.m., ANDREWS received a call on Target Telephone #1 from telephone number 508-292-4644, which is subscribed to in the name of Sharon Ferraro, 35 Ashumet Road #5D, Mashpee, MA (hereinafter "the JACKSON Telephone"), and ANDREWS spoke with JACKSON.  During the call, JACKSON identified himself as "Rick."  JACKSON added, "I got 40. Can you do me a gram, brother?"  ANDREWS said yes.  JACKSON said he would "get it back to [ANDREWS] you 'cause I'm working on a guy's truck in the village."

187. At approximately 12:46 p.m., ANDREWS received another call on Target Telephone #1 from the JACKSON Telephone, and ANDREWS gave JACKSON directions to his location.

188. On the basis of these calls and subsequent calls that same day where JACKSON placed additional orders of heroin, agents believe that ANDREWS sold JACKSON a gram of heroin.  JACKSON had $40 and acknowledged that he did not have enough money for the drugs ("get it back to you").  Agents believe that JACKSON promised to obtain the rest of the money after finishing a work project. ("I'm working on a guy's truck in the village.").  Other intercepted calls between JACKSON and ANDREWS revealed that ANDREWS had been selling heroin to JACKSON for approximately $100 per gram.

74

189.  Later that same day, at approximately 5:11 p.m.,
ANDREWS received a call on Target Telephone #1 from the JACKSON
Telephone.  JACKSON told ANDREWS:  "I need those four."

190. Agents believe that in this call, JACKSON ordered 4
more grams of heroin.

191. At approximately 5:32 p.m., ANDREWS used Target
Telephone #1 to call JACKSON on the JACKSON Telephone.  After
discussing a meeting location, ANDREWS confirmed that JACKSON
wanted "Four, right?"  ANDREWS asked "How much you got?"  JACKSON
stated "Four hundred."

192. Agents believe that in this call, ANDREWS confirmed
that JACKSON wanted to purchase 4 grams of heroin for $400.
Based upon a subsequent telephone call at approximately 5:43
p.m., in which JACKSON was intercepted discussing what he had
received from ANDREWS, agents believe that this 4-gram heroin
transaction was successfully completed.

    2.   **June 13, 2010:  JACKSON bought 2 grams of heroin
         from ANDREWS**

193. On June 13, 2010, at approximately 11:37 a.m., ANDREWS
used Target Telephone #1 to call JACKSON on the JACKSON
Telephone.  JACKSON told ANDREWS that he wanted "a half."
ANDREWS asked JACKSON if he was still at "the course," and told
JACKSON that he would be over there in two minutes.

194. Agents believe that in this call, JACKSON requested
half a gram of cocaine and provided his location to ANDREWS.

195. At approximately 11:42 a.m., ANDREWS received a call on Target Telephone #1 from the JACKSON Telephone.  During the call, JACKSON asked if ANDREWS could "do me a half for a little while." ANDREWS sought to clarify what JACKSON wanted, and asked, "two halves then?"  JACKSON said that he needed one for himself and one for someone else.  ANDREWS said he was on "the course," and JACKSON confirmed that they would meet up.

196. Agents believe that in this call, JACKSON increased his order of heroin to two half-gram quantities, one of which JACKSON intended to sell to another person.  Based upon subsequent telephone calls, agents believe that this heroin transaction was successfully completed.

197. Later on that same day, at approximately 1:17 p.m., JACKSON used the JACKSON Telephone to call ANDREWS on Target Telephone #1.  During the call, JACKSON identified himself as "Rick" and asked to see ANDREWS for a "[w]hole one."  JACKSON said he was at Maravista, and ANDREWS instructed him to "head up the way" and meet him in five or ten minutes.  At approximately 1:42 p.m., ANDREWS used Target Telephone #1 to call JACKSON on the JACKSON Telephone.  Jackson stated he was at "the fork" and was coming from Sam Turner Road.  Consistent with this call, surveillance observed JACKSON walking at the Hatchville Road-Turner Road fork.  Surveillance agents observed ANDREWS driving towards JACKSON, with both talking on cell phones.

198. Based on these calls, subsequent calls later that day for an additional quantity of heroin, and the surveillance observations, agents believe that ANDREWS sold JACKSON one gram (a "[w]hole one") of heroin.

### 3.    June 17, 2010: JACKSON bought 1 gram of cocaine and 3 grams of heroin from ANDREWS

199. On June 17, 2010, at approximately 12:14 p.m., ANDREWS received a call on Target Telephone #1 from the JACKSON Telephone. JACKSON asked whether ANDREWS had "white." ANDREWS said he had a little bit. Jackson said he needed a gram of white as well as "three grams of the brown." JACKSON said he was at the shop and would grab the money and then call ANDREWS back.

200. Agents believe that in this call, JACKSON ordered one gram of cocaine ("white") and three grams of heroin ("brown") from ANDREWS.

201. At approximately 12:17 p.m., ANDREWS received another call on Target Telephone #1 from the JACKSON Telephone. JACKSON asked ANDREWS to come to the shop, and ANDREWS agreed. At approximately 12:35 p.m., ANDREWS received a call on Target Telephone #1 from Jackson. ANDREWS said he was going to be there in five or ten minutes, and reassured JACKSON that he was going "to be right there."

202. Agents believe that in this call, JACKSON asked ANDREWS to come to the auto body shop where JACKSON worked. Based upon these calls, ANDREWS's statements that he was going to "be right

there," and the fact that there were no further intercepted calls inquiring where ANDREWS was, Agents believe that this drug transaction was successfully completed.

**4.    Additional information regarding JACKSON'S knowledge of his co-conspirators' drug trafficking activities**

203. Wire intercepts over Target Telephone #1 reveal that JACKSON was aware of HICKS and GRAHAM's participation in the narcotics-trafficking conspiracy.

204. On July 3, 2010, JACKSON placed a call to Target Telephone #1 and spoke with ANDREWS regarding a potential drug transaction.  ANDREWS informed JACKSON that he had no drugs available to sell.  JACKSON responded that "Rico got dope," ANDREWS replied, "Good for Rico; I ain't dealing with that mother fucker."  JACKSON then stated,  "No, I'm saying he getting it from fucking Sleep you know what I mean?"  ANDREWS responded, "That ain't nothing to do with me you know what I mean ..."

205. Agents believe that JACKSON, in this call, told ANDREWS that GRAHAM ("Rico") had heroin ("dope").  ANDREWS informed JACKSON that he did not care because he wanted nothing to do with GRAHAM.  JACKSON then stated that GRAHAM was getting his heroin from HICKS ("Sleep").  ANDREWS then replied that had nothing to do with him, which agents believe was because ANDREWS worked for FRYE, who was ANDREWS's source of heroin.

E.    **PINA**

206.  PINA was intercepted on Target Telephone #1 and Target Telephone #2.  Intercepted calls establish that PINA purchased drugs from both ANDREWS and FRYE.  Representative drug transactions are set forth below.

1.   **June 19, 2010:  PINA purchased half an ounce of cocaine from FRYE**

207.  On June 19, 2010, at approximately 7:22 p.m., FRYE used Target Telephone #1 to call PINA on PINA Telephone #1.  In this call, PINA said that he needed "half a rope."  FRYE said that it would be a few minutes and that he would go grab it.  PINA asked how much it would be, and FRYE stated that it would be "five."

208.  Agents believe that during this call, PINA ordered half an ounce of cocaine, or 14 grams.  "Half a rope" is a code word for half an ounce of cocaine.  In addition, the price FRYE charged for the "half a rope" - $500 - was consistent with prevailing market prices for half an ounce of cocaine.

209.  Later, at approximately 8:12 p.m., FRYE used Target Telephone #1 to call PINA again on PINA Telephone #1.  During this call, PINA said he was at PINA's house.  FRYE asked if PINA wanted him to go there, and PINA said yes.

210.  Moments later, surveillance agents observed FRYE arrive in a vehicle that stopped in front of PINA's Residence.  Agents observed FRYE exit the vehicle and approach PINA standing in front of PINA's Residence.  FRYE and PINA stood next to each

other for a time; however, from their vantage point, agents were unable to see whether they exchanged anything.  Within two minutes of arriving, FRYE departed in the same vehicle.

211. Based upon this sequence of events, agents believe that PINA purchased a half an ounce (14 grams) of cocaine from FRYE, which is a quantity consistent with drug re-distribution.

### 2.  June 14, 2010:  PINA purchased an undetermined quantity of drugs from ANDREWS

212. On or about 11:16 a.m. on June 14, 2010, PINA used PINA Telephone #1 to call ANDREWS on Target Telephone #1.  PINA advised ANDREWS that he wanted "two kids."  Agents believe that in this call, PINA ordered unspecified drugs from ANDREWS.

213. Approximately two minutes later, PINA again used PINA Telephone #1 to call ANDREWS on Target Telephone #1.  In this 15-second call, PINA told ANDREWS, "two and a half man."  Agents believe that in this call, PINA increased his prior order by "a half."

214. In an intercepted call over Target Telephone #1 at 11:41 a.m., PINA confirmed that ANDREWS knew where PINA was located.  Thereafter, at approximately 11:50 a.m., ANDREWS used Target Telephone #1 to call PINA Telephone #1.  ANDREWS told PINA that he was "twenty short."  PINA responded, "Come back.  Come back."

215. Based upon these intercepted calls, agents believe that the previously-discussed drug transaction was successfully completed.

**F.    WOBECKY**

216. WOBECKY was repeatedly intercepted on Target Telephone #6 using 774-302-6178 (hereinafter the "WOBECKY Telephone") ordering quantities of cocaine from MCGEE-BAKER.[27] Representative intercepted telephone calls are summarized below.

**1.    November 6, 2010:  WOBECKY purchased an eighth of an ounce of cocaine from MCGEE-BAKER**

217. At approximately 2:13 p.m. on November 6, 2010, WOBECKY called MCGEE-BAKER on Target Telephone #6.  WOBECKY advised MCGEE-BAKER that he needed "a biscuit."  MCGEE-BAKER told WOBECKY that he would "hit [him] up" in approximately 15 minutes.

218. Agents believe that in this call, WOBECKY ordered an eighth of an ounce of cocaine.  Based upon later communications involving WOBECKY, agents believe that "biscuit" is another term referring to an "eight ball" or "ball."

219. The next call between the WOBECKY Telephone and Target Telephone #6 took place at approximately 6:11 p.m. that same day,

_____

[27] Agents working on the investigation identified WOBECKY as the speaker in intercepted wire communications based upon various factors including, but not limited to, the following:  First, during intercepted calls, WOBECKY made statements concerning his location that were consistent with ongoing physical surveillance. Second, the WOBECKY Telephone was subscribed to in WOBECKY's own name.

when MCGEE-BAKER received a call from WOBECKY.  WOBECKY asked MCGEE-BAKER if he was ready, and advised MCGEE-BAKER that he was going over to "Hong Kong" to eat.  At approximately 6:27 p.m., MCGEE-BAKER received another call on Target Telephone #6 from WOBECKY when they spoke again about their respective locations. WOBECKY told MCGEE-BAKER that he had just been served his food. After MCGEE-BAKER suggested meeting at WOBECKY's "crib," WOBECKY told MCGEE-BAKER that he would "rather do it here than ... over there."

220. At approximately 6:40 p.m., WOBECKY used the WOBECKY Telephone to call MCGEE-BAKER on Target Telephone #6.  MCGEE-BAKER told WOBECKY, "I'm going to be there right now.  Going by the Stop & Shop light."  WOBECKY replied, "Alright, alright. I'll see you outside."

## 2. November 8, 2010:  WOBECKY purchased a gram of cocaine from MCGEE-BAKER

221. At approximately 5:23 p.m. on November 8, 2010, WOBECKY called MCGEE-BAKER on Target Telephone #6, and told him that he needed "just a jizzle."  MCGEE-BAKER told WOBECKY that he would be in the area in about fifteen or twenty minutes and MCGEE-BAKER stated he would call him in twenty minutes.

222. Agents believe that in this call WOBECKY sought a gram ("a jizzle") of cocaine.

223. About an hour later, at approximately 6:27 p.m., WOBECKY called MCGEE-BAKER on Target Telephone #6, and MCGEE-

82

BAKER confirmed that WOBECKY wanted "a grizzle."  WOBECKY then told MCGEE-BAKER that he would be at "Hong Kong" in a couple of minutes and the two agreed to meet there.

224. Agents believe that MCGEE-BAKER confirmed that WOBECKY wanted a gram ("a grizzle") of cocaine, and that the two agreed to meet at the Hong Kong Island restaurant.

225. At approximately 6:36 p.m., WOBECKY called MCGEE-BAKER again on Target Telephone #6, told MCGEE-BAKER that he was at the agreed-upon location.  MCGEE-BAKER indicated that he would be there shortly.  At approximately 6:42 p.m., WOBECKY called MCGEE-BAKER and told MCGEE-BAKER that he was outside.

226. On the basis of this last call and a call later that night in which WOBECKY indicated that he wanted to "grab another grizzle," agents believe that the two met as planned and that MCGEE-BAKER sold WOBECKY a gram of cocaine.

   3.   **November 9, 2010:  WOBECKY indicated that he had customers wanting cocaine**

227. At approximately 3:58 p.m. on November 9, 2010, WOBECKY used the WOBECKY Telephone to call Target Telephone #6, and WOBECKY spoke with MCGEE-BAKER.  WOBECKY asked MCGEE-BAKER, "What happened to you last night?"  After MCGEE-BAKER indicated something about his car, WOBECKY told MCGEE-BAKER, "I was trying to call you, I friggin' had a couple of big orders but I had a I had a car and shit too.  I was like fucking trying to tell you

don't come to my house and I was like ah shit can't get a hold of him."

228. Agents believe that in this call, WOBECKY told MCGEE-BAKER that he had a couple of large orders of drugs the night before, but that he could not reach MCGEE-BAKER.

### 4.  November 11, 2010:  WOBECKY purchased a gram of cocaine from MCGEE-BAKER

229. At approximately 4:16 p.m. on November 11, 2010, WOBECKY used the WOBECKY Telephone to call Target Telephone #6, and WOBECKY spoke with MCGEE-BAKER.  WOBECKY told MCGEE-BAKER, "I'll be back up town in a few and I'll grab probably a biscuit or something."  WOBECKY advised MCGEE-BAKER that he would "hit you up probably like fifteen."

230. Agents believe that in this call, WOBECKY indicated that he wanted an eighth of an ounce ("a biscuit") of cocaine from MCGEE-BAKER.

231. At approximately 6:23 p.m., WOBECKY called MCGEE-BAKER, and said, "I just want a gram right now though.  I don't need a biscuit right yet."  WOBECKY told MCGEE-BAKER that he was going to "the Chinese place in the plaza," and asked MCGEE-BAKER to meet him "in about ten minutes."  MCGEE-BAKER agreed.

232. Agents believe that in this call, WOBECKY advised MCGEE-BAKER that he wanted only a gram of cocaine and that he did not need an eighth of an ounce ("don't need a biscuit right yet").  Because a definite time and place had been identified and

there were no further intercepted discussions about this transaction, agents believe that this sale was completed as planned.

### 5. November 12, 2010: WOBECKY purchased approximately 4.5 grams of cocaine from MCGEE-BAKER

233. At approximately 4:45 p.m. on November 12, 2010, WOBECKY called MCGEE-BAKER on Target Telephone #6, and told MCGEE-BAKER that he was "heading up town right now," and that he needed a biscuit. MCGEE-BAKER asked WOBECKY if he was going to his "spot." WOBECKY replied, "I don't wanna go to my spot so I'd rather meet you somewhere in transition." The two agreed to meet at the "side of Kappy's," and WOBECKY told MCGEE-BAKER that he would call him in ten or fifteen minutes.

234. Agents believe that WOBECKY ordered an eighth of an ounce of unspecified drugs ("a biscuit") and agreed to meet with MCGEE-BAKER outside of Kappy's liquor store in Falmouth.

235. At approximately 5:05 p.m., WOBECKY called MCGEE-BAKER and said that he was at Kappy's. MCGEE-BAKER advised WOBECKY that he was stuck in traffic.

236. At approximately 5:20 p.m., an officer conducting surveillance observed WOBECKY standing next to a 2007 Chevrolet Trailblazer, bearing Massachusetts registration 2547KS in the front of the Kappy's Liquor Store parking lot. While under surveillance, WOBECKY was seen going in and out of the passenger

seat of the vehicle several times.  Officers also observed WOBECKY on a cell phone twice while standing next to the vehicle at the same time that agents monitoring interceptions on Target Telephone #6 reported that WOBECKY was on the phone with MCGEE-BAKER.

237. WOBECKY and MCGEE-BAKER were intercepted again on Target Telephone #6 at approximately 5:23 p.m. In this call, WOBECKY told MCGEE-BAKER, "I need another.  I need the biscuit and I need a extra jizzle too." MCGEE-BAKER responded, "Alright." WOBECKY also advised MCGEE-BAKER that he was "on that side thing where I usually see yeah, you know what I mean, between the building and shit." MCGEE-BAKER told WOBECKY that he was not in his own car because he lost his license and advised WOBECKY that he would be arriving shortly in the rear passenger seat of an unidentified vehicle.

238. Agents believe that in this call WOBECKY increased his prior order from an eighth of an ounce ("a biscuit") - i.e., approximately 3.5 grams - of cocaine to an eighth of an ounce plus another gram ("a extra jizzle") of cocaine.

239. At approximately 5:41 p.m., WOBECKY used the WOBECKY Telephone to call Target Telephone #6, and WOBECKY spoke with MCGEE-BAKER.  MCGEE-BAKER explained that there was "mad traffic" and that he would likely be there in about five minutes.  WOBECKY

told MCGEE-BAKER where he was parked.  MCGEE-BAKER told WOBECKY
that he was "all set" and would see him in five minutes.

240. At approximately 5:57 p.m., officers conducting
physical surveillance observed WOBECKY walk through the parking
lot to the right rear of Kappy's Liquor Store.  Wobecky met with
the rear passenger of a gray Mercury Mountaineer bearing
Massachusetts registration FF5723 for less than five seconds.[28]
WOBECKY then walked immediately back to the 2007 Chevrolet
Trailblazer, entered the passenger seat, and the vehicle left the
parking lot.  The gray colored Mercury Mountaineer left the
parking lot immediately after meeting WOBECKY.

241. Based upon this call, a later call that evening in
which WOBECKY asked MCGEE-BAKER whether he was "still up this
way," and the observations made during physical surveillance,
agents believe that the two met to complete this transaction.

## VI.    CONCLUSION

242. Based on the foregoing, I submit that there is probable
cause to believe that beginning on an unknown date but at least
from in or about August 2008, and continuing until on or about
November 16, 2010, ARIAS, BEARSE, GILSON, GRACIANI, GRAHAM,

---

[28]  Surveillance conducted earlier on November 12, 2010, at
approximately 11:49 a.m., and again at approximately 3:46 p.m.,
placed MCGEE-BAKER as a passenger in a gray Mercury Mountaineer
bearing Massachusetts registration FF5723.  On both occasions,
the vehicle was observed leaving the vicinity of Heritage Circle,
where MCGEE-BAKER lives.  On the first occasion, MCGEE-BAKER was
identified sitting in the rear seat.

HICKS, JACKSON, MCGEE-BAKER, PINA, SLAYTON, VAUGHN, and WOBECKY

did knowingly and intentionally combine, conspire, confederate

and agree with each other and with others known and unknown,

including ROSE, FRYE, FORD, and ANDREWS, to possess with intent

to distribute 100 grams or more of heroin, a Schedule I

controlled substance, and 500 grams or more of cocaine, a

Schedule II controlled substance, in violation of Title 21,

United States Code, Sections 841(a)(1), 841(b)(1)(B), and 846.


    I, Timothy Quinn, having signed this Affidavit under oath as
to all assertions and allegations contained herein, state that
its contents are true and correct to the best of my knowledge,
information, and belief.

_____
Timothy J. Quinn
Special Agent
Federal Bureau of Investigation


MAR 3 0 2011

Sworn and subscribed to before me this _____ day of March, 2011,
at Boston, Massachusetts.

_____
ROBERT B. COLLINGS
United States Magistrate Judge
District of Massachusetts