UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS

**UNITED STATES OF AMERICA**    )
                                )
         v.                     )   No.: 11-cr-10062-NMG
                                )
**RUSSELL ROSE, et al.,**       )
                                )
         **Defendants.**        )

### DECLARATION OF FBI SPECIAL AGENT TIMOTHY J. QUINN

I, Timothy J. Quinn, hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately thirteen (13) years. I am currently assigned to the Lakeville Resident Agency within the Boston Division, where my primary duties involve the investigation of federal drug- and weapons-related offenses.

2. I have received specialized training regarding the activities of narcotics traffickers and various aspects of narcotics investigations, including the methods used to package, transport, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics-trafficking activities.

3. In addition to my training, I have had extensive experience in the investigation of the activities of narcotics traffickers. Since joining the FBI, I have participated as a case agent and in subsidiary roles in dozens of narcotics investigations relating to the distribution of controlled

substances, including cocaine, heroin, cocaine base, marijuana, and other illegal substances in violation of the federal and state anti-drug laws, including Title 21, United States Code, Sections 841(a)(1) and 846.  I have participated in almost all aspects of narcotics trafficking investigations, including but not limited to conducting surveillance, using confidential informants and undercover officers, executing arrest and search and seizure warrants, and conducting court-authorized wire and electronic surveillance.  I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics-trafficking activities and the operation of narcotics-trafficking organizations.  I have sworn out numerous affidavits in support of search warrants, arrest warrants and other court applications.

    4.    Through my education, training and experience, I have become familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national, and international levels.

    5.    Since the Fall of 2008, I have participated in the investigation that culminated in the return of a Superseding Indictment in this matter.  I am familiar with the facts and circumstances of this investigation based on information I have received from a variety of sources, including but not limited to my own personal participation in the investigation, oral and

written reports made to me by other law enforcement officers and agents, physical surveillance, trash covers, debriefings of confidential informants and cooperating witnesses, public records, telephone toll records, pen register and trap and trace information, recorded jail calls, and my review of tapes and transcripts of court-ordered intercepted conversations and summaries of wiretap interceptions.

6. More specifically, I participated in the decision to install and use Global Positioning System Devices ("GPS devices") in connection with the investigation of this matter, and have personal knowledge as to how those devices were utilized during the investigation.

7. As will be discussed below, during the investigation, GPS devices were installed on four different vehicles believed to be operated by one or more of the individuals under investigation:

    a. A Lincoln Navigator bearing MA registration 42TA99, which was registered to Rachel Huffman and was operated by Kyle HICKS ("HICKS");

    b. A Nissan Stanza bearing MA registration 866GB8, which was registered to Christine Frye and was operated by Michael ANDREWS ("ANDREWS");

    c. A Honda Accord bearing Massachusetts registration 251DD5, which was registered to ANDREWS and was operated by ANDREWS; and

    d. A Mazda 6 bearing Massachusetts registration 632AB6, which was registered to Shashauna E. Raposa, and was operated by Omay FORD ("FORD").

8. The FBI has not performed testing regarding the position accuracy of the GPS tracking devices.  According to the "Global Positioning System Service Performance Standard," issued by the Department of the Defense (available at http://www.gps.gov/technical/ps/2008-SPS-performance-standard.pdf), "well designed GPS receivers have been achieving horizontal accuracy of 3 meters or better . . . 95% of the time[.]"  However, there are many factors that affect the accuracy of a particular GPS receiver at any point in time, including the ability of the receiver to receive GPS satellite data.  In addition, the FBI employs its GPS trackers to maximize covert surveillance ability, and as such, may not have employed optimal line of sight positioning of the receivers, which may have further degraded the devices' accuracy.

9. The GPS devices that were used in this investigation were part of a system that was able to provide both "real time" and historical location information.  The GPS devices communicated location information through a wireless connection with the FBI.  An FBI agent could access an FBI computer application to obtain "real time" information as to the location of the GPS device when a vehicle was moving.  During the periods in which a vehicle was moving but agents were not monitoring the location of the GPS in "real time," the location data nonetheless could be accessed at a later time through the FBI computer

application.  Additionally, the FBI computer application was programmed to transmit automated event messages via text message to the case agent (in this case, me) when certain activities occurred such as when the vehicle was stationary for an extended period and/or the vehicle began to move after having been stationary for an extended period.

10. The purpose of installing the GPS devices was not to obtain direct evidence of drug-trafficking activities of HICKS, ANDREWS, or FORD or to rely solely upon the tracking data from the devices in order to establish the specific location of their vehicles for evidentiary purposes.  As a result, there was no general practice followed with respect to saving data obtained from the devices or memorializing in specific instances the manner in which the devices were used.

   **A.  A "Slap On" GPS device Was Installed on a Lincoln Navigator bearing MA registration 42TA99**

11. On February 27, 2009, agents installed a "slap on" GPS device on a Lincoln Navigator bearing MA registration 42TA99 ("the Lincoln Navigator"), which was parked in the driveway of 90B Waterhouse Road in Bourne, MA.  GPS tracking data from this device was retained for the following period:  February 27, 2009, through November 4, 2009.

12. At various times, officers and I reviewed the data obtained from the GPS device to determine whether there were discernible patterns relating to HICKS's historical movements in

the Lincoln Navigator.  Although the GPS device was left on the Lincoln Navigator for a considerable period of time, the data provided by the device provided little worthwhile information that aided the investigation.

13.  For the most part, the GPS device on the Lincoln Navigator was of marginal utility in aiding officers who were conducting real-time surveillance.  The GPS device transmitted location data only approximately every 45 to 75 seconds while the Lincoln Navigator was moving.  As a result, when I tried to direct surveillance officers, who had lost visual contact with the Lincoln Navigator while it was moving, to the location where the GPS device indicated the Lincoln Navigator was, the officers were typically unsuccessful in relying upon the data from the GPS device to relocate the vehicle.  (The exception to this was in instances in which the Lincoln Navigator came to a stop for an extended period of time--i.e., for several minutes; in those instances, the GPS data could be used to locate the vehicle in its resting position.)

14.  More often than not, surveillance officers relied upon their own visual observations and/or information from other officers to relocate the vehicle rather than the tracking data to relocate the vehicle.  For example, I recall trying to use the GPS device on the Lincoln Navigator in connection with the controlled purchase conducted by CI-3 on June 4, 2009, as

discussed in my affidavit dated June 11, 2010, which was executed in support of an Application for Authorization to Intercept Wire Communications in M.B.D. No. 10-10198-PBS (hereinafter the "June 11, 2010 Quinn Affidavit"). Although I was tracking the Lincoln Navigator's movements on a laptop computer that was receiving the data from the GPS device, the data that I received from the GPS device merely confirmed the information that CI-3 received from HICKS, who instructed CI-3 where to meet via telephone. As discussed in the June 11, 2010 Quinn Affidavit, an undercover agent ("UC-1") accompanied CI-3 to the meeting with HICKS. CI-3 relayed the meeting instructions from HICKS to UC-1, who in turn provided that information via telephone to officers conducting surveillance.

### B. A "Slap On" GPS device Was Installed on a Nissan Stanza bearing MA registration 866GB8

15. On June 4, 2010, agents installed a "slap on" GPS device on a Nissan Stanza bearing MA registration 866GB8 ("the Nissan Stanza"), which was parked in the driveway of 242 East Falmouth Highway in East Falmouth, Massachusetts. GPS tracking data from this device was retained for the following periods: June 4, 2010, through June 29, 2010; and July 7, 2010, through September 9, 2010.

16. To my recollection, the data received from the GPS device on the Nissan Stanza was never used exclusively to determine the specific location of the vehicle. As of June 11,

2010, when the Honorable Patti B. Saris issued an order authorizing the interception of wire communications to and from mobile cellular phone number (508) 627-0113 (hereinafter "Target Telephone #1") in M.B.D. No. 10-10198-PBS, agents had other sources of information in which to determine ANDREWS's location: namely, intercepted wire communications in which ANDREWS and others discussed their respective locations and agreed upon specific locations in which to meet. (Additionally, although I believe not used, agents were also receiving switch and cell site locations for Target Telephone #1, which phone was regularly used by ANDREWS and co-defendant Kelvin FRYE).

17. I do not have a recollection of any particular incident where data from the GPS device on the Nissan Stanza was used successfully on a real-time basis to supplement surveillance being conducted by officers while the vehicle was moving. There may have been occasions in which I and/or other officers attempted to use the real-time data from the GPS device on the Nissan Stanza to supplement visual observations being made by surveillance officers who were following the vehicle; however, the data was of minimal usefulness as the device transmitted location data at intervals of approximately 60 seconds. As a result, in those instances in which a surveillance officer lost visual contact with the Nissan Stanza when it was moving, we attempted to use the GPS data to assist the officers in

reestablishing visual contact with the vehicle.  In these instances, I notified surveillance officers of the vehicle's approximate location based upon data received from the GPS device.  Surveillance officers would then head to that location; however, the vehicle had often moved and was not in sight.  In those instances, surveillance officers often had to rely upon other sources of information (such as intercepted calls) and/or traditional surveillance activities to relocate the vehicle.

18.  The GPS device was used on occasion to locate the Nissan Stanza when the vehicle was stationary for an extended period of time--i.e., for more than several minutes.

19.  On occasion, I or other agents reviewed the historical data obtained by the GPS device.  Review of this historical data provided information as to where the vehicle was parked for an extended period of time and/or overnight.

### C. A "Slap On" GPS device Was Installed on a Honda Accord bearing Massachusetts registration 251DD5

20.  On June 4, 2010, agents installed a "slap on" GPS device on a Honda Accord bearing MA registration 251DD5 ("the Honda Accord"), which was parked in the driveway of 242 East Falmouth Highway in East Falmouth, Massachusetts.  GPS tracking data from this device was retained for the following periods: June 4, 2010, through June 9, 2010.

21.  To my recollection, the data received from the GPS device on this vehicle was never used exclusively determine the

9

specific location of the vehicle.  As of June 11, 2010, when the
Honorable Patti B. Saris issued an order authorizing the
interception of wire communications to and from Target Telephone
#1, agents had other sources of information in which to determine
ANDREWS's location:  namely, intercepted wire communications in
which ANDREWS and others discussed their respective locations and
agreed upon specific locations in which to meet.  (Additionally,
although I believe not used, agents were also receiving switch
and cell site locations for Target Telephone #1, which phone was
regularly used by ANDREWS and co-defendant Kelvin FRYE).

22.  I recall occasions in which I and/or other officers
attempted to use the real-time data from the GPS device on the
Honda Accord to supplement visual observations being made by
surveillance officers who were following the vehicle; however,
the data was of minimal usefulness as the device transmitted GPS
data at intervals of approximately 60 seconds.  As a result, in
those instances in which surveillance officers lost visual
contact with the Honda Accord while it was moving, I attempted to
use the GPS data to assist the officers in reestablishing visual
contact with the Honda Accord.  In these instances, I notified
surveillance officers of the vehicle's approximate location based
upon data received from the GPS device.  Surveillance officers
would then head to that location; however, the Honda Accord had
often moved and was not in sight.  In those instances,
surveillance officers often had to rely upon other sources of

information (such as intercepted calls) and/or traditional surveillance activities to relocate the vehicle.

23. The GPS device was used on occasion to locate the Honda Accord when the vehicle was stationary for an extended period of time--i.e., for more than several minutes.

24. On occasion, I or other agents may have reviewed the historical data obtained from the GPS device; however, I have no specific recollection of doing so. Review of this historical data, if done, would have provided information as to where the vehicle was parked for an extended period of time and/or overnight.

25. Finally, it is my recollection that this GPS device stopped transmitting data at some point. I believe that this may have occurred on or about June 10, 2010, and that, as a result, agents never relied further on this device from that date through June 20, 2010, when the GPS device was removed from the Honda Accord.

### D. A "Slap On" GPS device Was Installed on a Mazda 6 bearing Massachusetts registration 632AB6

26. On November 16, 2010, agents installed a "slap on" GPS device on a Mazda 6 bearing Massachusetts registration 632AB6 ("the Mazda 6"), which was parked at a public alley at the 1900 block of Massachusetts Avenue in Boston, Massachusetts. No GPS tracking data from this device was retained.

27. The data from the GPS device was used on a real-time basis to supplement the visual observations of surveillance officers who were following the Mazda 6. It is my understanding that surveillance officers maintained visual contact with the Mazda 6 from the time FORD left his apartment in the vehicle to meet Russell ROSE ("Rose") at Rose's residence at 35 Woodland Parkway, in Randolph, Massachusetts. Data received from the GPS device confirmed the officers' visual surveillance. Based upon intercepted telephone calls on November 16, 2010, as well as separate observations by a different group of surveillance officers who were following ROSE, I had an independent belief that FORD ultimately was going to meet ROSE at ROSE's residence at 35 Woodland Parkway to deliver cocaine to ROSE.

28. No historical location data was ever obtained or reviewed from this device.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746. Executed on May 30, 2012.

*[signature]*

TIMOTHY J. QUINN
Special Agent
Federal Bureau of Investigation