
EXHIBIT A

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A one-family residence located at 35 Woodland<br>Parkway, Randolph, Massachusetts | )<br>)<br>)<br>)<br>)<br>)    Case No.   10 MJ 368 JCB |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1 to Affidavit of FBI Special Agent Timothy J. Quinn, which is incorporated herein by reference.

located in the _____ District of _____ Massachusetts _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-1 to Affidavit of FBI Special Agent Timothy J. Quinn, which is incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

See attached affidavit of FBI Special Agent Timothy J. Quinn.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Timothy J. Quinn, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 11/17/2010 _____

City and state:  Boston, MA

_____
*Judge's signature*

Hon. Jennifer C. Boal, U.S. Magistrate Judge
*Printed name and title*

AFFIDAVIT OF FBI SPECIAL AGENT TIMOTHY J. QUINN

I, Timothy J. Quinn, being duly sworn, deposes and states as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately 11 years. I am currently assigned to the Lakeville Resident Agency within the Boston Division where my primary duties involve the investigation of federal drug and weapons-related offenses. I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

2. During my employment with the FBI, I have conducted numerous investigations of violations of federal law involving bank robberies; white collar crime matters, including mail, wire, telemarketing, bankruptcy and insurance fraud; interstate transportation of stolen property; complex securities fraud; fugitive investigations; gang, drug, and weapons-related crimes. In the course of my work, I have utilized various investigative tools and techniques, including Title III intercepts or "wiretaps," confidential sources (CSs), cooperating witnesses (CWs), undercover officers (UCOs), physical surveillance, search warrants, telephone toll and pen register analysis, and witness interviews. I previously have submitted affidavits in conjunction with numerous applications for federal search warrants and arrest warrants.

3. I have received specialized training relating to drug investigations. For instance, I have completed the Drug Enforcement Administration's ("DEA's") Basic Narcotics School and the DEA's Telecommunications Exploitation Program. As a result of my training and experience and my consultation with other trained and experienced law enforcement officers, I have become familiar with the manner in which illegal drugs are transported, stored and distributed; the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs; the manner in which narcotics traffickers use cell phones, coded or slang-filled telephone conversations, and other means to facilitate their illegal activities; the vernacular of users and distributors of controlled substances and the methods by which such persons attempt to disguise the subjects of their conversations and operations; and the typical price, packaging, and methods of sale of narcotics in Eastern Massachusetts.

4. I am submitting this affidavit in support of a criminal complaint charging that the following individuals, along with others known and unknown to the government, did knowingly and intentionally conspire, combine, and agree to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C):

   a. RUSSELL ROSE, a/k/a "Double R", a/k/a "Baby Russell" (hereinafter "ROSE"), DOB –/–/1981; and

1

b.    Omay FORD a/k/a Papa Doc (hereinafter "FORD"), DOB –/–/1970.

5.    This Affidavit is also being submitted in support of search warrants for the following:

    a.    a one-family residence located at 35 Woodland Parkway, Randolph, Massachusetts (hereinafter "ROSE's Residence"). ROSE's Residence is light green with dark green trim. The number "35" is marked on the front and side doors. ROSE's Residence is titled in the name of Susan D. Rose, whom I believe is ROSE's mother. A full description of ROSE's Residence is attached hereto as Attachment A-1 to this Application and Affidavit for Search Warrant, which is incorporated herein by reference. The items to be seized from this location are described in Attachment B-1, attached hereto and incorporated herein.

    b.    a green 1996 Chevrolet S-10 pickup truck, bearing Massachusetts registration 893JJ4 (hereinafter "Vehicle #1"). The vehicle is registered to a Tanessa Hendricks. Vehicle #1 is currently located in the driveway at ROSE's Residence. A full description of this vehicle is attached hereto as Attachment A-2 to this Application and Affidavit for Search Warrant, which is incorporated herein by reference. The items to be seized from this vehicle are described in Attachment B-2, attached hereto and incorporated herein.

    c.    a black 2005 Mazda 6, bearing Massachusetts registration 632AB6 (hereinafter "Vehicle #2"). Vehicle #2 is currently located on the street immediately in front of ROSE's Residence. A full description of this vehicle is attached hereto as Attachment A-3 to this Application and Affidavit for Search Warrant, which is incorporated herein by reference. The items to be seized from this vehicle are described in Attachment B-3, attached hereto and incorporated herein.

6.    For the reasons set forth in this affidavit, probable cause exists to believe that ROSE's Residence, Vehicle #1 and Vehicle #2 contain evidence of conspiracy to commit controlled substance offenses, in violation of 21 U.S.C. § 846, as well as the identification of individuals who are engaged in the commission of the conspiracy.

7.    This affidavit sets forth the facts and evidence that are relevant to the requested search warrants and criminal complaint, but does not set forth all of the facts and evidence that I have gathered during the course of the investigation of this matter.

8.    The statements contained in this affidavit are based upon my own investigation, training and experience, upon information and reports supplied to me by detectives and officers of federal, state and municipal law enforcement agencies who are involved in this investigation and upon surveillance of wire communications intercepted pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

## II.    DISCUSSION OF EVIDENCE

9.    Law enforcement agents, including FBI agents and officers from other federal, state and local police agencies have been working on an investigation of RUSSELL ROSE since 2008. I have personally participated in the investigation since the Fall of 2008. As a result of this investigation, I believe that ROSE is an active cocaine trafficker.

10.    As will be discussed below, the investigation of ROSE has involved, among other investigative techniques, use of a confidential informant who purchased cocaine from ROSE.

11.    The investigation of ROSE has also involved court-authorized interceptions of wire communications in which ROSE has been intercepted negotiating to purchase and sell cocaine. On November 12, 2010, U.S. District Judge Patti B. Saris issued an Order authorizing the interception of wire communications to and from an AT&T Wireless telephone, number 617-470-6051 (the "ROSE Telephone"), subscribed to in the name of Ryan Law, 615 Blue Airhouse, Boston, MA 02119, and used by ROSE. Intercepted communications occurring over the ROSE Telephone have revealed that ROSE has been engaged in controlled substances transactions throughout the period of electronic surveillance.[1] As one recent example, which will be described below, between November 15, 2010, and November 16, 2010, agents intercepted a series of telephone calls between ROSE and FORD. These conversations concerned what I believe was to be a drug transaction in which FORD was going to sell cocaine to ROSE.

### A.    ROSE sold more than 50 grams of cocaine to an informant in November 2009

12.    Prior to the most recent intercepted negotiations, in November 2009, a confidential informant (hereinafter "CI-1") made a controlled purchase of approximately one ounce of cocaine from ROSE. On the day of the purchase, CI-1 met with several law enforcement agents, including me. CI-1 advised that, as previously directed by law enforcement agents, s/he had spoken on several occasions earlier that day with ROSE, who used telephone number 774-930-5162 (hereinafter "Earlier ROSE Telephone # 1"). CI-1 stated that during those conversations, s/he had made tentative arrangements to purchase one ounce of cocaine from ROSE at an agreed-upon location.[2] CI-1 also said that during an earlier meeting, s/he and ROSE had agreed to use a code word when discussing

---

[1] I recognize ROSE's voice from my review of various recorded prison tapes in which ROSE was a participant. Moreover, during intercepted calls on the ROSE Telephone, I have heard ROSE identify himself as "Russell" and "Russ."

[2] I am aware of what the agreed-upon location was but am not disclosing it here in order to protect the security of CI-1.

cocaine over the telephone.[3] I reviewed the call history of CI-1's telephone, which indicated several contacts with Earlier ROSE Telephone # 1 that took place earlier that day. Thereafter, two agents searched CI-1 and his/her car for money and contraband, with negative results.

13. Several minutes later, CI-1 placed a call to Earlier ROSE Telephone # 1 in my presence. I monitored the call by placing my ear to CI-1's telephone. I recognized ROSE as the individual using Earlier ROSE Telephone # 1 because I have previously reviewed several hours of recorded telephone calls involving ROSE. During this conversation, ROSE advised CI-1 that he was waiting for "this dude" to get back from another "mission." ROSE advised that he would call back when his guy was en route to the agreed-upon location.

14. CI-1 had several subsequent telephone calls with ROSE, all of which I monitored by placing my ear to CI-1's telephone. During these calls, ROSE advised that his boy was en route, and CI-1 provided directions to the agreed-upon location.

15. Later that day, CI-1 received a call in my presence from ROSE, who used Earlier ROSE Telephone # 1. I monitored the call by placing my ear to CI-1's telephone. ROSE advised that his boy was at the agreed-upon location. CI-1 asked ROSE how much he wanted for the cocaine, using the code word that CI-1 had previously identified to me. ROSE replied $1,200.

16. Eventually, surveillance agents observed a vehicle, matching a description previously provided by ROSE, pull into the parking lot of the agreed-upon location. The driver (hereinafter "ROSE's Courier") proceeded into a building at the agreed-upon location, where he met CI-1.[4] A surveillance agent observed CI-1 having a conversation with ROSE's Courier. Several minutes later, both individuals left the building and drove away.

17. CI-1 proceeded directly to a predetermined location for a meeting with law enforcement, where s/he provided me with a white rock-like substance contained in two clear plastic bags. CI-1 indicated that s/he gave ROSE's Courier approximately $1,200 in cash in exchange for the drugs.

---

[3]CI-1 told me the code word, but I am not disclosing it here in order to protect the security of CI-1.

[4]I believe I know the identity of ROSE's Courier, and I do know the make and model of the car s/he was driving, but I am not disclosing that information here in order to protect the security of CI-1.

18. The DEA Northeast Laboratory tested the substance ROSE's Courier provided to CI-1 and found that it contained 27.6 grams (net weight) of cocaine hydrochloride.

19. Later in November 2009, CI-1 made a controlled purchase of approximately one ounce of suspected cocaine from ROSE.

20. On that day, CI-1 placed a call in my presence to telephone number 508-524-1116, an AT&T Wireless cellular telephone subscribed to in the name of Kim Lopes, 62 Sandwich Road, Falmouth, MA 02540 (hereinafter "Earlier ROSE Telephone # 2").[5] I monitored the call by placing my ear to CI-1's telephone. During the call, CI-1 asked ROSE to meet with him/her so that s/he could pick up the same thing as last time. ROSE agreed. CI-1 and ROSE agreed to meet at a location in Falmouth. Thereafter, I searched CI-1 and his/her car for money and contraband, with negative results. I also gave CI-1 approximately $1,200 and equipped him/her with a transmitter.

21. Law enforcement agents monitored CI-1 as s/he arrived at the aforementioned location. Shortly after CI-1 arrived, I heard him/her speaking with at least two individuals, one of whom I recognized as ROSE. CI-1 later told me that almost immediately upon his/her arrival, ROSE handed him/her a package of suspected cocaine. CI-1 said that s/he and ROSE then walked over to CI-1's car, where CI-1 handed ROSE $1,200. CI-1 then left and was followed by surveillance agents directly to a predetermined meet location.

22. At the predetermined meet location, CI-1 provided me with a plastic bag containing a white rock-like substance. The substance field tested positive for the presence of cocaine. The DEA Northeast Laboratory tested the substance ROSE provided to CI-1 and found that it contained 26.8 grams (net weight) of cocaine hydrochloride.

**B.  FORD agreed to sell ROSE two kilograms of cocaine on November 16, 2010**

23. After the controlled purchases led to electronic surveillance, agents learned that ROSE intended to purchase cocaine from FORD. On November 16, 2010, at approximately 7:51 a.m., agents intercepted a telephone call from the ROSE Telephone to FORD.[6]

---

[5] CI-1 told me that ROSE told him/her to call Earlier ROSE Telephone # 2 rather than Earlier ROSE Telephone # 1.

[6] I believe that these calls involved FORD based upon the following facts: Agents conducting surveillance on November 16, 2010, identified FORD as the driver of Vehicle #2. The movements of that vehicle while under surveillance were consistent with the intercepted telephone conversations. Additionally, agents conducting surveillance observed FORD talking on the telephone at the same time that ROSE was intercepted talking to FORD. Moreover, in all of the intercepted conversations with ROSE on this day, FORD used the same telephone when speaking with ROSE.

FORD answered the phone saying "God damn papa." During the call, FORD told ROSE, "fan base, fan base." After ROSE responded, "Huh?", FORD repeated "fan base." FORD advised ROSE that "yeah man he said um he told me to put it out there man it's about to get ugly man everybody take, taking the Winter off." FORD further told ROSE "He said he just told me you know put it out there that ya certain company's is gonna take um winter off so." At that point, ROSE interrupted FORD and said, "Oh yeah." ROSE then advised FORD that "I'm gonna need a whole one yo." Later, ROSE asked FORD whether he wanted "to come get this thing." FORD responded affirmatively, saying "Yeah I wanted to go and get it yesterday." Later in the conversation, ROSE confirmed with FORD that he was "coming this way," and FORD told ROSE "I'll come out when you come back nigger ...". ROSE further stated that he would "just leave it in the truck."

24.     Based upon my training and experience, on ROSE's history as a drug trafficker, and on the subsequent calls described below, I believe that FORD used the phrase "fan base" as a code word for drugs or for a supplier who had previously sold drugs to ROSE via FORD. I believe that FORD advised ROSE that this may be the last quantity of cocaine available as his source was not going have more drugs for a while ("he told me to put it out there man it's about to get ugly man everybody take, taking the winter off"). I believe that when ROSE responded "I'm gonna need a whole one yo," he was telling FORD that he would purchase one kilogram of cocaine from FORD. I further believe that ROSE and FORD agreed that FORD would come to ROSE to complete the transaction.

25.     At approximately 10:16 a.m. on November 16, 2010, I observed an individual whom I later identified to be FORD enter Vehicle #2. At the time, Vehicle #2 was parked on Washington Street in Roxbury, MA. FORD was a black male, with short black hair, approximately six feet one inches tall, and a medium build. FORD was wearing glasses, a black and gray hooded sweatshirt with an emblem on the front, and blue jeans. FORD drove Vehicle #2 toward Massachusetts Avenue toward Route 93. At approximately, 10:20 a.m., I observed Vehicle #2 at the Roundhouse Motel on Melina-Case Boulevard and Massachusetts Avenue. The black Mazda proceeded to loop through parking lots in an effort to avoid police surveillance.

26.     At approximately 12:42 p.m. on November 16, 2010, agents intercepted another telephone call from the ROSE Telephone to FORD. Near the beginning of that intercepted call, FORD told ROSE "it's now or never." ROSE informed FORD that "I'm just getting up off the registry now, I'm gonna go to the crib and change up." Subsequently, FORD again advised ROSE "I'm just letting you know what's going on man, that's all. It's neither here nor there, you know what I mean ... [Unintelligible] ... that joker, I'm just letting you know what's good, that's all." ROSE then appears to understand the importance of what FORD told him, responding "Oh, oh, oh, oh, I thought you said you was coming this way. Oh you said that's now." FORD answered, "Yeah, it's now or never on that." FORD later told ROSE, "He just, he just wants, he just wants me to tell him what's up, because ah, I put two of them things on reserve, you know what

I mean, just, just to say something, you know what I mean." ROSE responded affirmatively and told FORD "let me hit you right back in two seconds."

27. During this intercepted call, I believe that FORD told ROSE that ROSE needed to make a decision whether he wanted to purchase drugs and what quantity of drugs he wanted to purchase ("it's now or never"). I also believe based upon my training and experience as well as on subsequent calls described below that when FORD told ROSE "I put two of them things on reserve," FORD told ROSE that he had placed an order of two kilograms of cocaine for ROSE with FORD's supplier.

28. Almost immediately after this call, at approximately 12:46 p.m. on November 16, 2010, ROSE used the ROSE Telephone to call a person I believe to be one of ROSE's co-conspirators (hereinafter "Co-Conspirator # 1").[7] During this intercepted call, ROSE asked Co-Conspirator # 1, "Yo, you need any . . .?" Co-Conspirator # 1 responded, "Ahhh, shhh, well how much is available." ROSE answered, "Shh, ah this nigga just said, 'fam's' coming down, and said them people is about to take a vacation, so he aint gonna back around for a minute." Later in the conversation, Co-Conspirator # 1 told ROSE, "I might grab me a whole thing." ROSE replied, "That's what I'm wanted to do, that shit's like right now! So, I'm, ah, I'm trying to hold him off til later on, man, cuz I ain't got it on me right now ..." ROSE further told Co-Conspirator # 1 that "I'm gonna see if he can hold them, if can hold them, we'll just tell him to hold two of them 'bitches.'"

29. During this intercepted call, I believe that ROSE sought input from Co-Conspirator # 1 to determine whether Co-Conspirator # 1 had any interest in buying drugs from FORD with ROSE ("you need any"). When Co-Conspirator # 1 told ROSE that he might grab me "a whole thing," I believe that Co-Conspirator # 1 indicated to ROSE that Co-Conspirator # 1 was interested in buying a kilogram of cocaine ("a whole thing"). I believe that ROSE then indicated to Co-Conspirator # 1 that he was going to try and get FORD to deliver the drugs later because ROSE did not have sufficient funds to complete the purchase immediately, and that he was going to ask FORD to hold two kilograms of cocaine for ROSE and Co-Conspirator # 1 ("we'll just tell him to hold two of them 'bitches'").

30. Roughly ten minutes after this call, at approximately 12:59 p.m. on November 16, 2010, an incoming telephone call from FORD was intercepted on the ROSE Telephone. During this call, FORD told ROSE that "Basically there's only two, two, um, that you know, reserved for me." ROSE replied, "Yup, I'll, I'll take them mother fuckers, yo." ROSE further told FORD that he would not be home immediately: "I'll wait til this nigga get's out of work, so I ain't gonna be back home, til about seven, eight, at least, that's at the

---

[7] The identity of Co-Conspirator # 1 is known to me on the basis of this investigation, and I am familiar with Co-Conspirator # 1's voice.

earliest ..." FORD advised ROSE that "I'll let him know the time frame" and that he would "hit you right back and let you know what he say."

31.    I believe that during this intercepted call ROSE told FORD that he wanted to buy the two kilograms of cocaine that FORD had reserved. Based upon this and subsequent phone calls, I believe that ROSE also told FORD that he needed to wait for Co-Conspirator # 1 to provide funds before ROSE was going to be heading home to complete the transaction, and that this would likely not occur until later sometime after 7:00 or 8:00 p.m.

32.    At approximately 1:12 p.m. on November 16, 2010, FORD was again intercepted calling the ROSE Telephone. During this call, FORD advised ROSE that "he said he's going to kick it back to me man. He will kick it back to me on that time frame." ROSE replied, "Oh, he will get back to you," to which FORD responded, "Yeah, yeah." FORD then explained to ROSE, "basically he's not going to shop it but you know he ain't going to let it go like you know what I mean somebody come knocking on the door know what I mean? But he knows, he knows what time it is so. He's like fifty fifty with it, so his other man that's giving it to him he's starving so either which way you will get it. You know what I mean." Subsequently, FORD returned to the same subject, "But I'm saying if, if somebody else comes knocking and it's right there in front of his face I don't think he's going to um, I don't he's gonna let them um he's not going to do it. It know what I mean? Because of the time frame. I think he just trying to balance up out of here but we will see but this beat's all ready that's all I'm telling you."

33.    I believe that during this intercepted telephone call, FORD told ROSE that FORD's source would sell the drugs to FORD ("he's going to kick it back to me man"). However, FORD also warned ROSE that while FORD's source indicated that he was going to hold the drugs for FORD, there was a chance that the source would sell the drugs if someone came in the interim and offered to buy the drugs.

34.    At various times during the day on November 16, 2010, surveillance agents observed ROSE enter Vehicle #1 and drive Vehicle #1. Among other things, ROSE was observed entering Vehicle #1 on two different occasions at the Brockton Registry of Motor Vehicles. Surveillance agents also observed ROSE in Vehicle #1 at 536 Thomas B. Landers, Falmouth, MA, and observed him driving Vehicle #1 in the vicinity of a Subway Restaurant in Falmouth, MA. In fact, Vehicle #1 was the only vehicle that surveillance agents saw ROSE operating that day.

35.    At approximately 2:45 p.m., a surveillance agent observed the black male who was subsequently identified to be FORD driving Vehicle #2 in the vicinity of Washington Street and Newcomb Street in Roxbury, MA.[8]

---

[8] The surveillance agents who observed FORD during surveillance later confirmed that FORD was the individual they had seen by reviewing a copy of FORD's driver's license

36. At approximately 7:03 p.m. on November 16, 2010, the ROSE Telephone received another phone call from FORD. During this intercepted call, FORD asked ROSE, "Yo what's happenin papa?" ROSE replied, "Trying to get things in order now." FORD responded, "Oh. Okay. [Unintelligible] Just hit me." FORD also asked ROSE "what kind of time frame we looking at." ROSE advised FORD, "I'm trying to get this girl right now so I'm just, once I get a hold of her I will hit you and give you exact location."

37. At approximately 7:27 p.m. on November 16, 2010, the ROSE Telephone was intercepted receiving a call from Co-Conspirator # 1. During this call, ROSE asked Co-Conspirator # 1, "You got the money with you?" Co-Conspirator # 1 responded that he did. ROSE instructed Co-Conspirator # 1 to meet him at Home Depot "right now." Co-Conspirator # 1 asked ROSE, "How much is it?" ROSE responded, "Ah same thing nigga thirty one and a half."

38. During this conversation, I believe that ROSE advised Co-Conspirator # 1 that the price was $31,500. Based upon my knowledge, training and experience, I know that this price is consistent with the current sale price for a kilogram of cocaine. As a result, based upon this telephone call and the quoted price, I believe that the drug transaction that had been discussed earlier in the day by ROSE and FORD concerned the sale of two kilograms of cocaine.

39. At approximately 7:39 p.m. on November 16, 2010, ROSE called Co-Conspirator # 1 using the ROSE Telephone. During this call, Co-Conspirator # 1 asked ROSE, "Where you at? Are you there already?" After ROSE responded affirmatively, Co-Conspirator # 1 said, "I'll be right there."

40. ROSE placed another call to Co-Conspirator # 1 using the ROSE Telephone at approximately 7:48 p.m. on November 16, 2010. During this intercepted call, ROSE and Co-Conspirator # 1 discussed where to meet and ultimately agreed to meet at a CVS.

41. At approximately 7:52 p.m., an agent conducting surveillance observed ROSE in Vehicle #1 back into a parking space on the left side of a CVS building in Wareham, MA. The surveillance officer observed ROSE enter the CVS pharmacy. The surveillance agent then observed ROSE meet with Co-Conspirator # 1. The surveillance agent reported that Co-Conspirator # 1 was in a black BMW sedan bearing Massachusetts Registration 67SX94. A surveillance agent then followed ROSE in Vehicle #1 to Route 495 Northbound. A surveillance agent followed ROSE directly to his residence in Randolph, MA. Based upon a subsequent intercepted telephone conversation, I believe that Co-Conspirator #1 delivered cash to ROSE as payment for his share of the cocaine that ROSE intended to purchase from FORD.

---

photograph from the Registry of Motor Vehicles and/or through personal observation of FORD after FORD's arrest.

42. At approximately 7:58 p.m., ROSE used the ROSE Telephone to call FORD. During this intercepted telephone call, ROSE advised FORD, "In motion man. In motion man." FORD told ROSE, "Okay, well uhm I'll be in motion too." ROSE replied, "Yeah I'm in motion man. I'm already over the bridge man."

43. During this intercepted call, I believe that ROSE told FORD that he was traveling en route to home ("in motion") and was already over the bridge returning from Cape Cod. FORD responded by saying that he would start driving to meet ROSE ("I'll be in motion too").

44. At approximately 7:57 pm, surveillance agents followed Vehicle #2 to an Applebee's Restaurant in the South Bay Mall in Dorchester, MA. According to the surveillance agents, the black male later identified as FORD became increasingly nervous and began to identify surveillance vehicles that were following him. The black male walked up to one of the surveillance officer's undercover vehicles and looked inside as an act of counter-surveillance. Surveillance agents observed FORD at the Applebee's Restaurant. At the same time that I was relaying information from the wire room that ROSE was calling his supplier using the ROSE Telephone, surveillance agents observed FORD in the lobby of the restaurant as he answered his cellphone and spoke with somebody on the phone.

45. At approximately 8:05 pm, surveillance agents observed Vehicle #2 leave the South Bay Mall (Applebee's Restaurant) and travel to RoseClaire Street (off Boston Street). At approximately 8:15 pm, the surveillance agents observed Vehicle #2 depart RoseClaire Street and travel to Route 93 South toward Braintree, MA. The agents observed Vehicle #2 at a Barnes and Noble Book Store (North Street @ Granite Street Braintree, MA) in the parking lot in the furthest space from the store entrance. Vehicle #2 was parked with the rear of the vehicle in the back of the space. The surveillance agents observed the black male operator, whom they subsequently identified as FORD, looking all around as he waited in the lot.

46. At approximately 8:29 p.m., ROSE used the ROSE Telephone to call another individual. During this intercepted telephone call, ROSE asked "What you doin tomorrow?" ROSE later stated "listen when you get back in town man dudes gonna be comin back. I need you to pick up everything from him and go put that shit deep." ROSE further stated, "You can keep the weed, there's gonna be 5 pounds of weed and 2 of them other things. So just ah have that nigga with you in case he gotta get out and run or whatever but I want you to put that deep."

47. Based on my training and experience, I believe that ROSE was telling this individual that ROSE was going to have five pounds of marijuana ("weed") and two kilograms of cocaine delivered to this person the next day. ROSE told the individual that the

individual could keep the five pounds of marijuana, but that ROSE wanted him to hide the 2 kilograms of cocaine ("go put that shit deep").

48. At 8:36 p.m. on November 16, 2010, a surveillance agent observed ROSE turning into the cul-de-sac where the ROSE Residence is located. Also at approximately 8:36 p.m. on November 16, 2010, ROSE was intercepted using the ROSE Telephone to call Co-Conspirator # 1. During this call, ROSE asked Co-Conspirator # 1, "Yo what, what was in the plastic?" Co-Conspirator # 1 responded "Twenty-eight." It is apparent to me that in this call ROSE was asking Co-Conspirator # 1 how much money was in the bag that Co-Conspirator # 1 gave to ROSE. When Co-Conspirator # 1 responded "28," I believe that Co-Conspirator # 1 was indicating $28,000.

49. At approximately 9:00 p.m., a surveillance agent followed Vehicle #2 to the Mobil On The Run Store at the intersection of Granite Street and Forbes Road in Braintree, MA. A surveillance agent observed the black male subsequently identified as FORD put fuel into Vehicle #2 and then parallel park Vehicle #2 along the adjacent wall in the gas station parking lot. Vehicle #2 was facing out and FORD again looked all around at approaching vehicles.

50. At approximately 9:14 p.m. on November 16, 2010, ROSE called FORD using the ROSE Telephone. ROSE and FORD simply exchanged a few words (ROSE: "Alright easy." FORD: "Alright.").

51. Based upon my knowledge, training, and experience, as well as ongoing surveillance, I believe that ROSE, in this call, was telling FORD that he was home and ready to consummate the drug transaction. Observations from agents who were conducting surveillance of both ROSE and FORD corroborate this conclusion.

52. At approximately 9:25 p.m., the agents conducting surveillance of Vehicle #2 driven by FORD observed an Acura SUV bearing Massachusetts registration 489GV4 (hereinafter "the Acura SUV") with two females arrive at the Mobil On The Run where Vehicle #2 was parked. The Acura SUV approached Vehicle #2. Vehicle #2 then pulled alongside the Acura SUV to greet the occupants of the Acura. The Acura SUV then turned around and followed Vehicle #2 out of the Mobil Station and onto Granite Street Southbound. A surveillance agent followed both vehicles directly to Jay's Market on Route 28 in Randolph, MA. This location is just south of ROSE's residence on Woodland Parkway.

53. At approximately 9:40 p.m., an agent conducting surveillance observed both the Acura SUV and Vehicle #2 at Jay's Market. The vehicles parked beside each other on the left side of the store. Both vehicles were facing inward with Vehicle #2 to the right of the Acura SUV.

54. A surveillance agent observed the black male subsequently identified to be FORD exit Vehicle #2, leaving his driver's side door open. FORD approached the passenger side door of the Acura SUV and leaned into the passenger side window. The driver of the Acura SUV exited the Acura SUV. FORD appeared to remove or get something from the passenger in the Acura SUV. FORD then returned to Vehicle #2 holding that item. FORD entered Vehicle #2 and proceeded to back out. The female driver of the Acura SUV was standing outside her car at that time. FORD drove off in Vehicle #2 and immediately turned right onto Woodland Parkway.

55. At approximately 9:39 p.m. on November 16, 2010, one last call was intercepted on the ROSE Telephone. ROSE called Co-Conspirator # 1 and advised Co-Conspirator # 1 that "This nigger chargin us up now man." ROSE told Co-Conspirator # 1 that "Five more hundred boy this nigger chargin us up now man." After Co-Conspirator # 1 replied, "That's crazy," ROSE responded, "He's killing us. He wants me to open it. You want a [unintelligible]."

56. In this intercepted call, I believe that ROSE was telling Co-Conspirator # 1 that FORD was asking for $500 more to purchase the cocaine than had previously been anticipated ("Five more hundred boy this nigger chargin us up now"). I believe that when ROSE told Co-Conspirator # 1 that FORD wanted ROSE to "open it," FORD was encouraging Co-Conspirator # 1 to open the money and count it.

57. At approximately 10:00 p.m., surveillance agents assisting in this investigation went to ROSE's Residence. Upon arrival, the surveillance agents observed Vehicle #2 parked on the street in front of ROSE's Residence. Vehicle #1, among other vehicles, was parked in the driveway.

58. One surveillance agent took a position at the front door (which had a designer glass oval front) while other surveillance agents approached the right front/side door. A surveillance agent observed three males in the living room area by looking through the glass front portion of the front door.[9] The surveillance agent advised other surveillance agents of his observations. A second surveillance agent knocked on the right side door and rang the doorbell. A few seconds later, ROSE approached the side door of the house. A surveillance agent observed ROSE carrying by a plastic sheet (8 x11) of stacked money in his hands. FORD turned around and was seen holding a stack or brick of money in his right hand while the third individual in the house remained seated. ROSE looked at the surveillance agents standing before him at the side door displaying their badges. A surveillance agent stated, "Police, can you open the door." ROSE responded by dropping the blinds and running toward the living room. A surveillance agent observed ROSE run

---

[9] FORD was seen standing in front of couch talking with ROSE, who was initially seated facing the front door. A third individual, who has since been identified, was seated closest to the front door.

into the living room screaming. Both ROSE and FORD grabbed unknown items off of the couch that ROSE was originally seated on. The third individual also jumped up and all three men tried to run up the stairs (split entry ranch) running into each other at the same time. A surveillance agent advised the other surveillance agents that they were running upstairs and towards the back side of the house. A surveillance agent then observed ROSE run back across to the left in to a room. Another surveillance agent, who was positioned at the rear of the house, reported that several males ran into the left rear bedroom and appeared to be reaching for or concealing something on the floor. All of the males in the left rear bedroom disappeared from his sight.

59. At that juncture, surveillance agents went into the house and arrested ROSE and FORD.[10] Other surveillance agents froze the scene pending the filing of this application for a search warrant for the residence.

### III. Drug Traffickers' Use of Residences and Vehicles Generally

60. I have participated in the execution of numerous search warrants at the residences of drug-traffickers such as the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following kinds of drug-related evidence have typically been recovered:

      a.     controlled substances, such as cocaine and marijuana;

      b.     paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

      c.     books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

      d.     personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

      e.     electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and or store the information described above;

---

[10] In submitting this affidavit and for the purpose of establishing probable cause, I am not relying upon any observations made by the surveillance agents after they entered the residence.

13

f.     cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals such as gold and silver, and precious gems such as diamonds;

g.     documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and

h.     cellular telephones.

61.    In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

62.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia in their residences. Further, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

63.    Based upon my training and experience, I am also aware that it is generally a common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

64. Based on my training and experience and involvement in this investigation, I know ROSE and FORD have regularly communicated using cellular telephones. A cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training, experience, and research, I know that many cellular telephones have capabilities described above. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices.

65. I believe that ROSE frequently uses ROSE's Residence as his residence. According to ROSE's probation officer, ROSE provided this address as his home address. A check of the records at the Registry of Motor Vehicles reveals that this address is also the address listed for ROSE.

66. During this investigation, I have had concerns about searching ROSE's Residence. Earlier cell-site information had indicated that ROSE often spent significant time at his girlfriend's residence in Wareham, not at ROSE's Residence. Moreover, until the events that took place on November 16, 2010, and the days immediately preceeding that date, I did not have significant information indicating that ROSE stored drugs, money, or other contraband at his residence; on the contrary, it appeared during the investigation that ROSE stored drugs and/or money in outdoor locations away from his residence.

67. Nonetheless, based upon the information set forth above, including the intercepted telephone conversations between FORD and ROSE and between ROSE and Co-Conspirator #1 and other co-conspirators, I submit that the evidence establishes probable cause to believe that, during the evening of November 16, 2010, ROSE used ROSE's Residence in furtherance of his drug trafficking activities, and that evidence regarding those activities, including, but not limited to, cash, drugs, drug ledgers, cell phones and other tools of the drug trade will be found at his residence. A full listing of the items to be seized from the residence appears in Attachment B-1.

68.   Similarly, based upon my training and experience, I am aware that drug traffickers like ROSE and FORD often use their vehicles in furtherance of their drug trafficking activities. Based upon my knowledge and experience, I am aware that for many of the same reasons identified above, drug traffickers use their vehicles in furtherance of their drug trafficking activities, and that evidence regarding those activities, including, but not limited to, cash, drugs, drug ledgers, cell phones, and other tools of the drug trade are often found in their vehicles. During the investigation, I have seen ROSE operate and occupy as a passenger numerous vehicles. However, as stated earlier, on November 16, 2010, Vehicle #1 was the only vehicle in which ROSE was seen operating, and he was seen operating this vehicle throughout the day, including when he met with Co-Conspirator #1 at the CVS. Accordingly, I believe that such evidence may be found in the vehicles used on November 16, 2010, by ROSE and FORD – i.e., Vehicle #1 and Vehicle #2 respectively. A full listing of the items to be seized from Vehicle #1 and Vehicle #2 appears in Attachments B-2 and B-3, respectively.

**CONCLUSION**

69.   Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that ROSE and FORD did knowingly and intentionally conspire, combine, and agree with each other and with and others known and unknown to the government, to possess with intent to distribute and to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).

70.   Based upon the foregoing, and based upon my training and experience, I further submit that there is probable cause to believe that the ROSE Residence identified above and in Attachment A-1 presently contains the items set forth above and in Attachment B-1, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, violations of Title 21, United States Code, Sections 846. Accordingly, I respectfully request that a search warrant be issued for the seizure of these items in the subject premises described above.

71.   Based upon the foregoing, and based upon my training and experience, I further submit that there is probable cause to believe that Vehicle #1 and Vehicle #2 as described in Attachments A-2 and A-3, respectively, presently contain the items set forth in Attachments B-2 and B-3, respectively, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, violations of Title 21, United States Code, Sections 846. Accordingly, I respectfully request that a search warrant be issued for the seizure of these items in the subject vehicles described above.

TIMOTHY J. QUINN
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me, this _____ day of November 2010.


HON. JENNIFER C. BOAL
United States Magistrate Judge



17

## ATTACHMENT A-1

(Description of Property to be Searched)

A one-family residence located at 35 Woodland Parkway, Randolph, Massachusetts. The residence is light green with dark green trim. The number "35" is marked on the front and side doors.

The photograph below accurately reflects the premises to be searched:



## **ATTACHMENT A-2**

(Description of Property to be Searched)

One green 1996 Chevrolet S-10 pickup truck, bearing Massachusetts registration 893JJ4. The vehicle is currently located in the driveway at 35 Woodland Parkway, Randolph, MA.

## ATTACHMENT A-3

(Description of Property to be Searched)

One black 2005 Mazda 6, bearing Massachusetts registration 632AB6.  This vehicle is currently located on the street immediately in front of the residence at 35 Woodland Parkway, Randolph, MA.

# ATTACHMENT B-1

Items, documents, records, files, and other information that constitutes evidence, contraband, fruits of violations of Title 21, United States Code, Section 846, or property that was designed for use, intended for use, or used in committing violations of Title 21, United States Code, Section 846, including:

1. controlled substances;

2. documentary or other evidence manifesting dominion and control over the subject premises, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers;

3. U.S. currency;

4. books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances;

5. proceeds of drug sales and records of drug trafficking;

6. evidence pertaining to obtaining, secreting, transfer, concealment and or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers;

7. cellular and/or portable telephones;

8. retained copies of tax returns;

9. books or papers which reflect names, addresses and/or telephone numbers of associates in the trafficking organization;

# ATTACHMENT B-2

Items, documents, records, files, and other information that constitutes evidence, contraband, fruits of violations of Title 21, United States Code, Section 846, or property that was designed for use, intended for use, or used in committing violations of Title 21, United States Code, Section 846, including:

1. controlled substances;

2. documentary or other evidence manifesting dominion and control over the subject vehicle, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers;

3. U.S. currency;

4. books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances;

5. proceeds of drug sales and records of drug trafficking;

6. evidence pertaining to obtaining, secreting, transfer, concealment and or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers;

7. cellular and/or portable telephones;

8. books or papers which reflect names, addresses and/or telephone numbers of associates in the trafficking organization.

## ATTACHMENT B-3

Items, documents, records, files, and other information that constitutes evidence, contraband, fruits of violations of Title 21, United States Code, Section 846, or property that was designed for use, intended for use, or used in committing violations of Title 21, United States Code, Section 846, including:

1.    controlled substances;

2.    documentary or other evidence manifesting dominion and control over the subject vehicle, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers;

3.    U.S. currency;

4.    books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances;

5.    proceeds of drug sales and records of drug trafficking;

6.    evidence pertaining to obtaining, secreting, transfer, concealment and or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers;

7.    cellular and/or portable telephones;

8.    books or papers which reflect names, addresses and/or telephone numbers of associates in the trafficking organization.